# THE A. S. ABELL PUBLISHING COMPANY v. ALBERT J. MEZZANOTE ET AL.

[No. 139, September Term, 1982.]

*Decided September 12, 1983.*

The cause was argued before SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ., and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), specially assigned.

*Douglas D. Connah, Jr.,* with whom were *Christopher J. Fritz, Elizabeth C. Honeywell* and *Venable, Baetjer and Howard* on the brief, for appellant.

*Lewis A. Noonberg,* with whom were *Thomas J. Gisriel* and *Piper & Marbury* on the brief, for appellees.

DAVIDSON, J., delivered the opinion of the Court.

This case presents the question whether the Maryland Insurance Guaranty Association (MIGA), established by Maryland Code (1957, 1979 Repl.Vol. & 1982 Cum.Supp.), Art. 48A, §§ 504-519, is an agency or instrumentality of the State of Maryland within the scope of Maryland Code (1957, 1980 Repl.Vol. & 1982 Cum.Supp.), Art. 76A, §§ 1-5A (Public Information Act), that requires public records to be open for public inspection. The relevant statutory provisions are

Md. Code, Art. 48A, § 504 (a), § 506; Md. Code, Art. 76A, § 1A, § 2 (a), and § 1 (b).

Article 48A, § 504 (a) provides in pertinent part:

"The purposes of this subtitle are to provide a mechanism for the prompt payment of covered claims under certain insurance policies and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer; to assist in the detection and prevention of insurer insolvencies; and to provide for the assessment of the cost of such payments and protection among insurers."

Article 48A, § 506 provides in pertinent part:

"There is created a nonprofit unincorporated legal entity to be known as the Maryland Insurance Guaranty Association. All insurers defined as member insurers in § 505 (e) [1] shall be and remain members of the Association as a condition of their authority to transact insurance in this State."

Article 76A, § 1A provides in pertinent part:

"[A]ll persons are entitled to information regarding the affairs of government and the official acts of those who represent them as public officials and employees. To this end, *the provisions of this act shall be construed in every instance with the view toward public access,* unless an unwarranted invasion of the privacy of a person in interest would result therefrom, and the minimization of costs and time delays to persons requesting information."

---

**1.** Art. 48A, § 505 (e) provides in pertinent part:

" 'Member insurer' means any insurer which (1) writes any kind of insurance to which this subtitle applies ... and (2) is licensed to transact insurance in this State."

Art. 48A, § 504 (b) provides in pertinent part:

"This subtitle shall apply to all kinds of direct insurance, except life insurance, health insurance, and annuities."

Article 76A, § 2 (a) provides in pertinent part:

"All public records shall be open for inspection by any person at reasonable times. . . ."

Article 76A, § 1 (b) provides in pertinent part:

" 'Public records' when not otherwise specified shall include any paper, correspondence, form, book, photograph, photostat, film, microfilm, sound recording, map, drawing, or other written document, regardless of physical form or characteristics, and including all copies thereof, that have been made by any branch of the State government, including the legislative, judicial, and executive branches, by any branch of a political subdivision, and by *any agency or instrumentality of the State* or a political subdivision, or received by them in connection with the transaction of public business. The term 'public records' also includes the salaries of all employees of the State, of a political subdivision, and *any agency or instrumentality* thereof, both in the classified and nonclassified service." (Emphasis added.)

In a letter dated 24 February 1982, John H. Fairhall, a reporter for the Evening Sun, which is owned by the appellant, A. S. Abell Publishing Co. (publisher), asked the appellee, Albert J. Mezzanote, Chairman of the Board of Directors of MIGA (Chairman of the Board), for the right to inspect certain records [2] pursuant to the Public Information

---

2. The requested records, enumerated in the 24 February 1982 letter, were as follows:

"(a) MIGA budget and payroll data from the agency's inception, about 1971, to the present. These data should include a list of all employees, by name, with salary.

"(b) All correspondence and memoranda between MIGA and the state insurance division, 1975 to the present.

"(c) MIGA's selection of a claims adjusting firm and payments to that (or those) firms, since 1971. Included should be records related to the Free State adjusting company.

"(d) Companies and individuals hired by MIGA since 1971, including consultants and attorneys. MIGA payments to these persons and firms should be included."

Act. In a letter dated 8 March 1982, the request was denied because MIGA "is not an agency or instrumentality of the State," and because "some or all [of the requested records] contain confidential information."

On 22 March 1982, in the Circuit Court of Baltimore City (now the Circuit Court for Baltimore City), the publisher, pursuant to Art. 76A, § 5 (b) (1),[3] filed suit against the Chairman of the Board and MIGA. In an amended complaint, the publisher sought an "injunction and order for production of public records" and an award of reasonable attorney fees and costs pursuant to Art. 76A, § 5 (b) (6).[4]

On 8 July 1982, MIGA and the Chairman of the Board filed a motion for summary judgment in which they pointed out that Art. 76A, § 2 mandated access only to "public records," and § 1 (b) defined a public record as including a record made or received by "an agency or instrumentality of the State." They asserted that MIGA was a "private non-profit unincorporated legal entity," and that, although created for a public purpose, it was not sufficiently controlled by the State to be characterized as an agency or instrumentality of the State. They also argued that the characterization of MIGA as a private entity was supported by legislative history and administrative interpretation. They concluded that MIGA was therefore not subject to the Public

---

3. Art. 76A, § 5 (b) (1) provides in pertinent part:

"On complaint of any person denied the right to inspect any record covered by this article, the circuit court in the jurisdiction in which the complainant resides, or has his principal place of business, or in which the records are situated, has jurisdiction to enjoin the State, any county, municipality, or political subdivision, any agency, official or employee thereof, from withholding records and to order the production of any records improperly withheld from the complainant."

4. Art. 76A, § 5 (b) (6) provides in pertinent part:

"The court may assess against any defendant governmental entity or entities reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the court determines that the applicant has substantially prevailed."

Information Act and was not subject to an award of attorney fees and costs. MIGA additionally argued in the alternative that, even if it were subject to the Public Information Act, some of the records requested by the publisher would be exempt from disclosure, either under the terms of the Act, Art. 76A, § 3,[5] or because of the attorney/client privilege.

The publisher filed a motion for summary judgment in which it asserted that MIGA served a public purpose and was sufficiently subject to State control to be deemed an agency or instrumentality of the State. It concluded that MIGA was therefore subject to the Public Information Act and to an award of attorney fees and costs.

The trial court concluded that MIGA was not an agency or instrumentality of the State within the scope of the Public Information Act. In view of this conclusion, the trial court did not determine whether any of the requested records were exempt from disclosure under Art. 76A, § 3, or whether attorney fees and costs should be awarded under Art. 76A, § 5 (b) (6). On 21 July 1982, the trial court entered a final order that granted MIGA's motion for summary judgment and denied the publisher's motion for summary judgment. Costs were divided between the parties.

---

5. Some of the provisions of Art. 76A, § 3 that might be relevant include § 3 (a) (iv) and § 3 (b) (v).

§ 3 (a) (iv) provides in pertinent part:
"The custodian of any public records shall allow any person the right of inspection of such records or any portion thereof except on one or more of the following grounds . . .

. . .

"(iv) *Such public records are privileged or confidential by law.*"

§ 3 (b) (v) provides in pertinent part:

"The custodian may deny the right of inspection of the following records or appropriate portions thereof, unless otherwise provided by law, if disclosure to the applicant would be contrary to the public interest:

. . .

"(v) *Interagency or intraagency memorandums or letters* which would not be available by law to a private party in litigation with the agency."

The publisher appealed to the Court of Special Appeals. We issued a writ of certiorari before consideration by that Court. We shall reverse the judgment of the trial court.

The Public Information Act provides that the public is entitled to information regarding the affairs of government, Art. 76A, § 1A. To that end, the Public Information Act provides that the public has the right to inspect the public records of any branch of the State government, § 1 (b) & § 2 (a). Moreover, the Public Information Act expressly states that its provisions "shall be broadly construed in every instance with the view toward public access," § 1A. Thus, the provisions of the Public Information Act reflect the legislative intent that citizens of the State of Maryland be accorded wide-ranging access to public information concerning the operation of their government. Accordingly, in determining whether MIGA is an agency or instrumentality of the State within the scope of the Public Information Act, the language of § 1 (b) must be liberally construed in favor of inclusion in order to effectuate the Public Information Act's broad remedial purpose. *See Keesling v. State,* 288 Md. 579, 589, 420 A.2d 261, 266 (1980); *James v. Prince George's County,* 288 Md. 315, 335, 418 A.2d 1173, 1184 (1980).

MIGA was established in 1971 by the General Assembly, 1971 Md.Laws, ch.703. Its purpose is to protect the public by avoiding financial loss to policyholders and claimants resulting from the insolvency of insurers and by preventing insurer insolvencies, Art. 48A, § 504 (a). MIGA is designated as a "nonprofit unincorporated legal entity," § 506, and all insurers providing insurance other than life insurance, health insurance, and annuities are required to be members of MIGA as a condition of their authority to operate in Maryland, § 504 (b). MIGA is required to exercise its powers through a Board of Directors (Board) serving fixed terms. Directors are appointed by the State Insurance Commissioner of Maryland (Commissioner) who also fills vacancies. The Chairman of the Board, however, is elected from the Board by its members, § 506 & § 507 (a). The Board is authorized to delegate certain of its powers and

duties subject to approval by the Commissioner, § 509 (d).

MIGA is vested with broad authority. It is required to pay claimants on covered claims against an insolvent insurer, Art. 48A, § 508 (a) (1), (2), & (4); to allocate claims paid and expenses incurred subsequent to an insolvency and to assess its member insurers accordingly, § 508 (a) (3); and to designate member insurers as "servicing facilities" for the handling of claims subject to the approval and right of removal by the Commissioner, § 508 (a) (6) & § 510 (b) (3).

Additionally, MIGA is authorized to hire or retain employees to handle claims, Art. 48A, § 508 (b) (1). MIGA is also authorized to borrow funds, § 508 (b) (2); sue or be sued, § 508 (b) (3); enter into contracts, § 508 (b) (4); and to perform other acts necessary to effectuate its purposes, § 508 (b) (5).

MIGA is funded from assessments paid by its members, Art. 48A, § 508 (a) (3). It is exempt from all State and local taxes, except for property taxes, § 515, and from liability from any action taken in the performance of its powers and duties, § 517.[6]

The Commissioner also is vested with broad authority with respect to MIGA's operation. In addition to the authority to appoint the Board of Directors, to approve the delegation of the Board's powers, and to approve or revoke the designation of a member insurer as a "servicing facility," the Commissioner has the authority, and indeed is required, not only to approve all plans of operation and amendments submitted by the Board, but also under certain circumstances, to promulgate necessary rules. More particularly, MIGA is required to perform its functions under a plan of operation (plan) consisting of rules and regulations that establish the procedures to be followed by MIGA when exercising its

---

**6.** Art. 48A, § 517 provides:

"There shall be no liability on the part of and no cause of action of any nature shall arise against any member insurer, the Association or its agents or employees, the board of directors, or the Commissioner or his representatives for any action taken by them in the performance of their powers and duties under this subtitle."

powers or performing its duties. The plan and any necessary or suitable amendments must be submitted to the Commissioner by the Board and become effective upon approval by the Commissioner, Art. 48A, § 509 (a) (1). If at any time the Board fails to submit suitable amendments, the Commissioner is required to adopt reasonable rules that continue in force until modified by the Commissioner or superseded by a plan submitted by the Board and approved by the Commissioner, § 509 (a) (2). Upon approval, all member insurers are required to comply with the plan, § 509 (b).

The Commissioner has the authority to entertain an appeal by any member insurer aggrieved by a final action of MIGA, Art. 48A, § 509 (c) (7). Additionally, the Commissioner is authorized to revoke a member insurer's authority to operate in Maryland if the member insurer fails to pay an assessment or fails to comply with the plan of operation, § 510 (b) (2). Finally, MIGA is subject to examination and regulation by the Commissioner. Indeed, its Board is expressly required to submit an annual financial report to the Commissioner, § 514.

The central issue in this case concerns the test to be applied in determining whether MIGA is an agency or instrumentality of the State within the scope of the Public Information Act. MIGA maintains that "the true test of whether an entity is a State instrumentality is whether that entity is under the complete control of the State." It concludes that because the State does not exercise control over all aspects of MIGA's operation, MIGA is not an agency or instrumentality of the State. In response, while the publisher concedes that "State control is indicative of an organization's governmental status," it contends that it is not necessary for the State to have control over all aspects of the organization's operation in order to be characterized as a State agency or instrumentality. It asserts that the State exercises a sufficient degree of control over MIGA to characterize MIGA as an agency or instrumentality of the State within the scope of the Public Information Act.

This Court has repeatedly recognized that there is no single test for determining whether a statutorily-established entity is an agency or instrumentality of the State for a particular purpose. All aspects of the interrelationship between the State and the statutorily-established entity must be examined in order to determine its status. *Katz v. Washington Suburban Sanitary Comm'n,* 284 Md. 503, 510, 397 A.2d 1027, 1031 (1979) (sovereign immunity); *O & B, Inc. v. Maryland-National Capital Park & Planning Comm'n,* 279 Md. 459, 462, 369 A.2d 553, 555 (1977) (sovereign immunity); *see, e.g., Board of Trustees of Howard Community College v. John K. Ruff, Inc.,* 278 Md. 580, 587, 366 A.2d 360, 364 (1976) (sovereign immunity); *University of Maryland v. Murray,* 169 Md. 478, 481, 182 A. 590, 592 (1936) (equal protection). In each of these cited cases, this Court held that a statutorily-established entity was an agency or instrumentality of the State, notwithstanding the fact that the State did not exercise control over all aspects of the entity's operation. These cases demonstrate that complete control — control over all aspects of an entity's operation — is not a determinative factor in characterizing a statutorily-established entity as an agency or instrumentality of the State. Rather, a number of factors, including the degree of control by the State over the entity, must be taken into account.

Moreover, this Court has previously rejected the contention that the sole test to be applied in characterizing a statutorily-established entity as an agency or instrumentality of a government is whether the entity is subject to its complete control. In *Moberly v. Herboldsheimer,* 276 Md. 211, 345 A.2d 855 (1977), this Court considered whether a statutorily-established entity, a corporation known as the Board of Governors of the Memorial Hospital of Cumberland (Hospital), was a private corporation or an agency of the City of Cumberland (City) within the scope of the Public Information Act.[7]

---

7. At the time this Court considered *Moberly,* Md. Code (1957, 1975 Repl.Vol.), Art. 76A, § 1 (a) provided in pertinent part:

In *Moberly,* the record showed that the Hospital was established by the General Assembly, 1927 Md.Laws, ch.411. That Act authorized the Mayor and City Council of Cumberland to spend bond proceeds for the purpose of taking title to land and erecting the Hospital. Section 6 of the Act created a Board of Governors consisting of seven members, including the Mayor of the City and the President of the Board of Commissioners of Allegany County, both of whom were ex-officio members. As to the remaining general members, the Board was self-perpetuating in that it was authorized to fill its own vacancies. The Board was empowered to select the land for the Hospital, title to which was to be in the name of the Mayor and City Council of Cumberland, and it was to select plans for the building and enter into contracts for the erection and equipping thereof. Under § 9 of the Act, the Board was given the power to make rules and regulations for the operation and maintenance of the Hospital. The Board was empowered under § 10 to regulate charges and salaries, as well as to hire employees. Section 11 of the Act authorized, but did not require, the Mayor and City Council to appropriate amounts necessary to cover deficits in operation and maintenance of the Hospital. Section 13 provided that the City and the Board of Governors would be exempt from tort liability for the negligent operation of the Hospital.

By 1929 Maryland Laws, chapter 515, the provisions of the original Act were amended. The Board was "made and

"The term 'public records' when not otherwise specified shall include any paper, correspondence, form, book, photograph, photostat, film, microfilm, sound recording, map drawing, or other document, regardless of physical form or characteristics, and including all copies thereof, that have been made by the State and any counties, municipalities and political subdivisions thereof and by any *agencies of the State,* counties, *municipalities,* and political subdivisions thereof, or received by them in connection with the transaction of public business, except those privileged or confidential by law. The term 'public records' also includes the salaries of all State employees, both in the classified and nonclassified service, and all county and municipal employees, whether in a classified or nonclassified service." (Emphasis added.)

That section was amended to its present form by 1978 Md.Laws, ch. 1006, effective 1 July 1978, and recodified as Art. 76A, § 1 (b).

constituted a body politic and corporate," given perpetual succession, and the capacity to sue and be sued. In addition, the Board was granted all powers necessary and proper to operate and manage the Hospital "as fully as if incorporated for such purposes under the provisions of the Public General Laws of Maryland."

In *Moberly,* it was expressly contended that the Hospital was not an agency of the City because the City did not exercise complete control over the Hospital's operation. There, it was pointed out that the Board was self-perpetuating so that its actions could not be effectively controlled by the City; that it was authorized to manage its own internal affairs, independent of governmental control, and was entirely separate from and independent of the City in its corporate acts and control; that no obligation existed between the Hospital and the City to discharge a municipal function; that the income of the Hospital was derived from patient fees, State appropriations, and bequests and not from the City; that the City did not include the Hospital in its budget; and that the City was powerless to change a decision made by the Hospital Board.

In determining whether the Hospital was an agency of the City within the scope of the Public Information Act, this Court did not regard the City's lack of complete control over the Hospital's operation as dispositive. Rather, it took into account all aspects of the interrelationship between the City and the Hospital, including the Hospital's public purpose, the degree of control exercised by the City, and the Hospital's immunity from tort liability. The Court there held that, although the City did not exercise complete control over the Hospital's operation, the Hospital was nonetheless an agency of the City.

Applying these principles here produces a clear result. The record shows that MIGA was established by the General Assembly so that its existence is subject to legislative control. It was established for a public purpose and has the obligation to protect claimants, policyholders, and indeed the public, by preventing member insurer insolvency and

paying claimants on covered claims against an insolvent member insurer.

MIGA can be effectively controlled by the State because its Board is not self-perpetuating. Although the Directors serve fixed terms and the Chairman of the Board is elected by its members, the Commissioner appoints the Directors and fills vacancies. MIGA is not authorized to manage its affairs independent of governmental control. Its plan of operation, consisting of various rules and regulations establishing all of its procedures, is subject to approval and amendment by the Commissioner; the delegation of certain powers by the Board is subject to approval by the Commissioner; its designation of a member insurer as a "servicing facility" is subject to approval and revocation by the Commissioner; and it is expressly subject to examination and regulation by the Commissioner to whom its Board is required to submit an annual report. Moreover, the Commissioner has power to change a decision made by the Board as a result of the authority to entertain appeals from the Board's final actions. Additionally, MIGA has no authority to enforce its regulations. Although all insurers are required to be members, it is the Commissioner, not the Board, who is authorized to revoke a member insurer's authority to operate if it fails to pay an assessment or comply with the plan. Finally, the General Assembly afforded MIGA special status by exempting it from State and local taxes other than property taxes, and from liability for actions taken in the performance of its duties.

In sum, MIGA's existence depends upon the General Assembly; it serves a public purpose, its management is selected by the Commissioner, and is not self-perpetuating; it does not independently manage its affairs or enforce its regulations; its decisions may be reversed by the Commissioner; and it enjoys a special tax and liability status. We recognize that the State does not exercise control over all aspects of MIGA's operation. Nevertheless, the degree of control exercised by the State over MIGA's operation exceeds the degree of control exercised by the City over the

Hospital's operation in *Moberly*. After examining all aspects of the interrelationship between the State and MIGA, including the degree of control exercised by the State over MIGA's operation, we are persuaded that MIGA is an agency or instrumentality of the State within the scope of the Public Information Act. Such an interpretation is consonant with the statutory mandate that the Public Information Act be liberally construed in order to effectuate its broad remedial purpose.

In reaching this result, we have considered the remaining contentions and find them to be without merit. More particularly, we recognize that the General Assembly has not expressly characterized MIGA as an agency or instrumentality of the State. We note that on some occasions, the General Assembly has expressly characterized certain entities that it has established as State "agenc[ies]," *e.g.,* Md. Code (1957, 1979 Repl.Vol.), Art. 101, § 71 (a) (commissioners of the State Accident Fund), or "instrumentalit[ies]," *e.g.,* Md. Code (1978, 1982 Cum.Supp.) § 18-1303 (b) of the Education Article (Maryland Higher Education Supplemental Loan Authority). Other entities established by the General Assembly have been expressly characterized as "not a department, agency, or instrumentality of the State," *e.g.,* Md. Code (1957, 1981 Repl.Vol., 1982 Cum.Supp.), Art. 10, § 45D (The Maryland Legal Services Corporation). In some cases, the General Assembly has not expressly stated whether an entity that it has established is or is not an agency or instrumentality of the State, *e.g.,* Md. Code (1978 & 1982 Cum.Supp.) §§ 18-1001 — 18-1014 of the Education Article (Maryland Higher Education Loan Corporation). Whether such an entity is characterized as an agency or instrumentality of the State for a particular purpose depends upon the facts. *E.g., Katz,* 284 Md. at 510, 397 A.2d at 1031 (sovereign immunity); *O & B, Inc.,* 279 Md. at 462, 369 A.2d at 555 (sovereign immunity); *see, e.g., Moberly,* 276 Md. at 225, 345 A.2d at 863 (Public Information Act). Manifestly, the absence of a legislative designation is not determinative of MIGA's status. Thus, there is nothing in the legislative history that supports a conclusion contrary to the one we reach here.

Similarly, we recognize that in both an opinion of the Attorney General, 60 Op.Att'y Gen. 394, 402 n.3 (1975), and a letter signed by an Assistant Attorney General dated 2 February 1982, appearing in the record here, the view was expressed that MIGA was not an agency or instrumentality of the State. While an opinion of the Attorney General is entitled to consideration in determining legislative intent, it is not binding upon the courts. *Schmidt v. Beneficial Finance Co. of Frederick,* 285 Md. 148, 158, 400 A.2d 1124, 1129 (1979); *Mayor of Baltimore v. State,* 281 Md. 217, 228, 378 A.2d 1326, 1332 (1977). We do not find either of the expressed views with respect to MIGA's status to be persuasive because the only rationale offered was that the State did not exercise control over all aspects of MIGA's operation.

Having found nothing in the legislative history, the Attorney General's administrative interpretation, or any other contention that leads us to a result contrary to the one we reach here, we shall reverse the judgment of the trial court and remand the case to that court for further proceedings. On remand, the trial court shall determine whether any of the requested records are exempt from disclosure under Art. 76A, § 3.

Moreover, on remand, attorney fees and costs should not be awarded pursuant to Art. 76A, § 5 (b) (6). Ordinarily, a specific enactment prevails over an incompatible general enactment in the same or another statute. *Employment Sec. Admin. v. Browning-Ferris, Inc.,* 292 Md. 515, 526, 438 A.2d 1356, 1363 (1982); *Criminal Injuries Compensation Bd. v. Gould,* 273 Md. 486, 495, 332 A.2d 55, 61 (1975); *Maguire v. State,* 192 Md. 615, 623, 65 A.2d 299, 302 (1949); *see Montgomery County v. Lindsay,* 50 Md.App. 675, 678, 440 A.2d 411, 413 (1982). Additionally, Art. 48A, § 11 specifically provides that the provisions of Art. 48A shall prevail over other statutory provisions relating to insurance

matters.[8] Accordingly, Art. 48A, § 517, granting immunity from liability to MIGA and its agents, prevails over Art. 76A, § 5 (b) (6), permitting the assessment of attorney fees and costs in cases under the Public Information Act. Similarly, Art. 48A, § 517 prevails over Md. Code (1974, 1980 Repl.Vol.) § 7-104 (a) (1) and (2) of the Courts and Judicial Proceedings Article, permitting the assessment of appellate costs against a State agency.[9] Under these circumstances, there shall be no allocation of appellate costs.

> *Judgment of the Circuit Court of Baltimore City (now the Circuit Court for Baltimore City) reversed.*
> *Case remanded to the Circuit Court for Baltimore City for further proceedings in accordance with this opinion.*
> *Each party to pay own costs.*

---

**8.** Art. 48A, § 11 provides:

"Provisions of this article relative to a particular kind of insurance or a particular type of insurer or to a particular matter shall prevail over provisions relating to insurance in general or insurers in general or to such matter in general."

**9.** § 7-104 of the Courts Article provides in pertinent part:

"(a) In general. — (1) Costs shall be allowed to or awarded against the State or one of its agencies or political subdivisions which is a party to an appeal from an executive, administrative, or judicial decision, in the same manner as costs are allowed to or awarded against a private litigant.

"(2) The State, its agency, or the political subdivision shall pay the costs awarded against it."