721 A.2d 196

William E. KIRWAN et al.

v.

THE DIAMONDBACK et al.

No. 57, Sept. Term, 1997.

Court of Appeals of Maryland.

Dec. 8, 1998.

76

Dawna M. Cobb, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for appellants/cross–appellees.

Lee Levine (Elizabeth C. Koch, Levine Pierson Sullivan & Koch, L.L.P., on brief), Washington, DC, of counsel: Raymond Ku, Washington, DC, for appellees/cross–appellants.

Argued before BELL, C.J., RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

ELDRIDGE, Judge.

We issued a writ of certiorari in this case to decide whether the Maryland Public Information Act, Maryland Code (1984, 1995 Repl.Vol., 1997 Supp.), § 10–611 through § 10–628 of the State Government Article, or the federal Family Educational Rights and Privacy Act, 20 U.S.C. § 1232(g), authorizes the nondisclosure of certain information requested from the University of Maryland, College Park, by *The Diamondback*, a campus newspaper. We must also decide whether the trial judge erred in refusing to award attorney fees to *The Diamondback*.

I.

In February 1996 the University of Maryland, College Park campus, notified the National Collegiate Athletic Association (NCAA) that a student-athlete accepted money from a former coach to pay the student-athlete's parking tickets. The student-athlete was suspended for three games as a result. *The Diamondback* began investigating this incident and other alleged incidents involving the men's basketball team. The investigation was in response to allegations that certain members of the men's basketball team were parking illegally on campus, for example parking in handicapped spaces, and were receiving preferential treatment from the University with respect to the parking violation fines imposed. On several occasions, *The Diamondback* requested documents pursuant to the Maryland Public Information Act, Code (1984, 1995 Repl.Vol., 1997 Supp.), § 10–611 through § 10–628 of the State Government Article. The documents requested were: (1) copies of all correspondence between the University and the NCAA involving the student-athlete who was suspended and any other related correspondence during February 1996; (2) records relating to campus parking violations committed by other members of the men's basketball team; and (3) records relating to parking violations committed by Gary Williams, who is the head coach of the men's basketball team.

The University denied the requests on the ground that the Maryland Public Information Act did not authorize disclosure of the documents. The University claimed that records of any parking tickets received by Coach Williams are personnel records and therefore nondisclosable under the Maryland statute, and also that the records of parking tickets are financial records and thus exempt from disclosure. In addition, the University asserted that the documents relating to the student-athletes are educational records and that the federal Family Educational and Privacy Rights Act, 20 U.S.C. § 1232(g), prohibits disclosure.

*The Diamondback* filed the present action in the Circuit Court for Prince George's County to compel the University to disclose the requested documents. The plaintiff also requested attorney fees. The parties agreed that there were no factual issues to be resolved, and the court decided the case on the plaintiff's summary judgment motion. The court granted the plaintiff's request for the documents but denied the request for attorney fees.

The University appealed to the Court of Special Appeals, and *The Diamondback* filed a cross-appeal. Before the Court of Special Appeals heard the case, we issued a writ of certiorari. *Kirwan v. Diamondback,* 346 Md. 372, 697 A.2d 112 (1997).

## II.

■ The Maryland Public Information Act establishes a public policy and a general presumption in favor of disclosure of government or public documents. The statute thus provides (§ 10–612(a) and (b) of the State Government Article):

"(a) *General Right to information.*—All persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees.

(b) *General construction.*—To carry out the right set forth in subsection (a) of this section, unless an unwarranted invasion of the privacy of a person in interest would result,

this Part III of this subtitle shall be construed in favor of permitting inspection of a public record, with the least cost and least delay to the person or governmental unit that requests the inspection."

The statute also contains a broad definition of a "public record."[1] Section 10–613(a) of the Act states that, "[e]xcept as otherwise provided by law, a custodian shall permit a person or governmental unit to inspect any public record at any reasonable time." Sections 10–615 through 10–617 delineate certain public records which are not disclosable, and § 10–618 deals with "permissible denials."

■ Recently this Court in *Fioretti v. Maryland State Board of Dental Examiners*, 351 Md. 66, 73, 716 A.2d 258, 262 (1998), quoting *A.S. Abell Publishing Co. v. Mezzanote*, 297 Md. 26, 32, 464 A.2d 1068, 1071 (1983), reiterated that " 'the provisions of the Public Information Act reflect the legislative intent that citizens of the State of Maryland be accorded wide-ranging access to public information concerning the operation of their government.' " We have on several occasions explained that the provisions of the statute "must be liberally construed ... in order to effectuate the Public Information Act's broad remedial purpose." *A.S. Abell Publishing Co. v. Mezzanote, supra*, 297 Md. at 32, 464 A.2d at 1071. *See Cranford v. Montgomery County*, 300 Md. 759, 771, 481 A.2d

---

1. Section 10–611(g)(1) states that a public record:

 "means the original or any copy of any documentary material that:
 (i) is made by a unit or instrumentality of the State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business; and
 (ii) is in any form, including:
 1. a card;
 2. a computerized record;
 3. correspondence;
 4. a drawing;
 5. film or microfilm;
 6. a form;
 7. a map;
 8. a photograph or photostat;
 9. a recording; or
 10. a tape."

221, 227 (1984); *Faulk v. State's Attorney for Harford County,* 299 Md. 493, 506–507, 474 A.2d 880, 887 (1984).

The University asserts that all of the requested documents fall into one or more of the exemptions from disclosure set forth in the Maryland Public Information Act and that, therefore, the documents need not be released. The University claims that any records concerning parking tickets received by Coach Williams are exempt from disclosure under § 10–616(i) of the Act because they constitute personnel records. The University further argues that the records regarding the student-athletes contain financial information and thus are exempt from disclosure under § 10–617(f). Finally, the University maintains that disclosure of the records would be "contrary to the public interest" in violation of § 10–618 and would be an "unwarranted invasion" of privacy in violation of § 10–612.

### A.

We shall first address the University's contention that documents relating to any parking tickets that Coach Williams may have received are personnel records. Personnel records are exempt from disclosure under § 10–616 of the Maryland statute which provides in pertinent part as follows:

"(a) *In general.*—Unless otherwise provided by law, a custodian shall deny inspection of a public record, as provided in this section.

\* \* \* \* \* \*

(i) *Personnel records.*—(1) Subject to paragraph (2) of this subsection, a custodian shall deny inspection of a personnel record of an individual, including an application, performance rating, or scholastic achievement information."

The term "personnel record" is not expressly defined in the statute. Nonetheless, the language of subsection (i) discloses what type of documents the Legislature considered to be personnel records. The statute lists three categories of documents which are: (1) an application for employment; (2) performance rating; and (3) scholastic achievement. Al-

though this list was probably not intended to be exhaustive, it does reflect a legislative intent that "personnel records" mean those documents that directly pertain to employment and an employee's ability to perform a job. Whether Coach Williams received parking tickets has little or nothing to do with his employment, his status as an employee, or his ability as a coach. It means only that he was alleged to have parked illegally.

The University's theory seems to be that, because the campus police issue the tickets and the Department of Campus Parking matches those tickets to students and employees, records of parking tickets somehow become personnel records. At the University, the campus police issue tickets and then those tickets are sent to the Department of Campus Parking. The Department of Campus Parking attempts to match the vehicles that were ticketed to a student or employee at the University. If the Department of Campus Parking succeeds in matching a student or employee to a vehicle ticketed, the Bursar's office posts the fine to the individual's account. If the Department of Campus Parking is unsuccessful in matching the ticketed vehicle to a student or employee, the ticket is sent to the Maryland Motor Vehicle Administration.

The fact that parking tickets issued on the College Park campus are handled differently than parking tickets elsewhere does not transform a parking ticket received by an employee into a personnel record. A parking ticket received by anyone else at his or her place of employment would ordinarily not be considered a personnel record. A parking ticket is simply a document charging a very minor misdemeanor. Records of tickets issued by the campus police do not relate to Coach William's hiring, discipline, promotion, dismissal, or any matter involving his status as an employee. Accordingly, they do not fit within the commonly understood meaning of the term "personnel records." *See Blandon v. State*, 304 Md. 316, 319, 498 A.2d 1195, 1196 (1985) (the Court will "reject a proposed statutory interpretation if its consequences are inconsistent with common sense").

■ As previously discussed, the policy of the Public Information Act is to allow access to public records. Generally, the statute should be interpreted to favor disclosure. In light of this policy, we do not believe that the General Assembly intended that *any* record identifying an employee would be exempt from disclosure as a personnel record. Instead, the General Assembly likely intended that the term "personnel records" retain its common sense meaning. This is indicated by the list following the prohibition on the release of the personnel records. The release of information regarding parking tickets accumulated by Coach Williams is not within the personnel records exemption contained in the statute.[2]

## B.

■ The University alternatively argues that records relating to parking tickets accumulated by the students and Coach Williams constitute financial information which is exempt from disclosure by § 10–617. Section 10–617 states in relevant part as follows:

> "(a) *In general.*—Unless otherwise provided by law, a custodian shall deny inspection of a part of a public record, as provided in this section.

* * * * * *

---

**2.** The University relies on several Attorney General opinions to support its argument that parking tickets are personnel records. The University primarily relies on 78 Att'y Gen.Op. 297 (1993) and a broad definition of "personnel records" from the Department of Personnel contained in that opinion to bolster the argument that "personnel records" include the parking ticket records relating to Coach Williams. Nevertheless, in the same opinion, the Attorney General cited *Michigan Professional Employees Society v. DNR*, 192 Mich.App. 483, 499–500, 482 N.W.2d 460, 467 (1992), for the proposition that the common meaning of a personnel record is "a record that identifies an employee, is kept by the employer, and related to matters like hiring, firing, promotion, discipline, or dismissal of the employee." This definition would not include records of parking tickets. *See Providence Journal Co. v. Kane*, 577 A.2d 661, 663 (R.I.1990) (personnel records include "employment history, qualifications, job classifications, status within the civil service system, ... work schedule, ... and overtime history").

(f) *Financial information.*—(1) This subsection does not apply to the salary of a public employee.

(2) Subject to paragraph (3) of this subsection, a custodian shall deny inspection of the part of a public record that contains information about the finances of an individual, including assets, income, liabilities, net worth, bank balances, financial history or activities, or creditworthiness."

The University asserts that the failure to pay a parking ticket is a "financial matter between those individuals and the University, and the [statutory] exemption for financial records protects the requested records from disclosure." (Appellant's brief at 20).

Like the term "personnel records," the term "financial information" is not expressly defined in the statute, but the language of subsection 10–617(f)(2) indicates what type of information the Legislature considered to be financial information. Records of parking tickets would not seem to fall in the same category as information about "assets, income, liabilities, net worth, bank balances, financial history or activities, or creditworthiness."

■ The University argues that records of parking tickets are records of indebtedness to the University and, as such, constitute "financial information." A principal problem with the University's argument is its equating a parking ticket with a debt. As previously mentioned, a parking ticket is a citation charging a misdemeanor; it is not a record of indebtedness. *See* Maryland Code (1977, 1992 Repl.Vol., 1997 Supp.), §§ 26–201 through 26–204, and 26–301 through 26–306 of the Transportation Article. *See also* Maryland Rule 4–102(b) (" 'Citation' means a charging document, other than an indictment, information, or statement of charges, issued to a defendant by a peace officer or other person authorized by law to do so"). Section 26–301(b) of the Transportation Article grants the University the authority to establish parking regulations and to provide "for the issuance of a citation" for a violation of a parking regulation. *See also* Code (1978, 1997 Repl.Vol.), § 12–109(e)(17) of the Education Article (authorizes the Presi-

dent of the College Park campus to "[e]stablish traffic regulations for the campus").

The recipient of the parking ticket can either pay the fine to the University or elect to stand trial in the District Court of Maryland. *See* § 26–303(a) of the Transportation Article ("(1) The person receiving a citation under this subtitle shall: (i) Pay for the parking violation directly to the . . . State agency serving the citation; or (ii) Elect to stand trial for the violation"). If the recipient of the parking citation fails either to pay the fine or to stand trial, the University is authorized to notify the Maryland Motor Vehicle Administration which may then refuse to "register or transfer the registration of any vehicle involved in a parking violation." § 26–305. The basic nature of the parking citation is not changed because the University normally does not report students or employees for violations of the parking regulations or failure to pay fines for violations of parking regulations; the University has the right to do so. Similarly, the nature of the parking ticket is not changed because the University collects the fine itself as it is authorized to do by § 26–303.

Throughout the Transportation Article of the Maryland Code, the sanction for a parking violation is referred to as a fine and not a debt. *See, e.g.,* §§ 26–305(a)(1)(i), 26–305(a)(3)(i), 26–305(c)(2), 26–305(e), of the Transportation Article. The fact that those who violate the parking regulations at the College Park campus may pay the University rather than another agency of the State does not change the sanction imposed from a fine to a debt. A debt and a fine are very different from each other. *Kerr v. Kerr,* 287 Md. 363, 370, 412 A.2d 1001, 1005, (1980) ("'fines' . . . whether in the nature of civil or criminal penalties, are not debts within the meaning of section 38 [constitutional prohibition on imprisonment for debt]"); *Brown v. Brown,* 287 Md. 273, 279–280, 412 A.2d 396, 400, (1980) ("the term debt does not include fines or penalties levied against one who has been adjudged in violation of the public law"); *Ruggles v. State,* 120 Md. 553, 564, 87 A. 1080, 1084 (1913) (recognizing that the monetary penalty authorized by statute for "operating a motor vehicle without a license" is

a fine and not a debt); *State v. Mace*, 5 Md. 337, 350–351 (1854) (holding that, while it is unconstitutional to imprison someone for failure to pay a debt, it is constitutional to imprison someone for failure to pay a fine; "the term debt is to be understood as an obligation, arising otherwise than from the sentence of a court for the breach of the public peace or commission of a crime"). *See also Middleton v. Middleton,* 329 Md. 627, 630, 620 A.2d 1363, 1364 (1993).

In sum, a parking ticket is a charging document accusing the recipient of a petty crime, and the monetary penalty imposed for a parking violation is a fine rather than a debt. Records of parking tickets, therefore, are not records of indebtedness. Consequently, they would not constitute "financial information" under the University's theory that records of indebtedness constitute "financial information" within the meaning of the Public Information Act.

Moreover, the Public Information Act itself indicates that most parking tickets are not exempt from disclosure. Specifically, § 10–616(h) of the Act exempts from disclosure police reports of traffic accidents, criminal charging documents, and "traffic citations" *only if* the "request [for] inspection of records [is] for the *purpose of soliciting or marketing legal services."* (Emphasis added). Clearly, if the General Assembly believed that traffic tickets were financial records, on the theory that a ticket represents a debt owed to the state, then there would have been no need to deal with traffic tickets in § 10–616(h) which allows broad access to tickets except under very narrow circumstances. If records of traffic tickets were nondisclosable under the financial information exemption, the General Assembly would not have dealt with them differently in § 10–616(h). Obviously, the General Assembly did not intend to classify records of parking tickets as financial information and exempt records of the tickets from disclosure.

## C.

The University argues that disclosure of the requested records "is against the public interest" and therefore would be

in violation of § 10–618 of the Maryland Public Information Act. (Appellants' brief at 15–16). According to the University, disclosure is contrary to the public interest because "it would have a chilling effect on the University's obligation to self-report any NCAA violations" and "would discourage students from coming forward to admit to or advise the University about potential NCAA rules violations." *Id.* at 16.

The University's "public interest" argument is based upon the language of § 10–618 of the Public Information Act relating to "permissible denials." Section 10–618(a) permits a custodian of public records to deny inspection of records "as provided in this section" if the custodian believes that inspection "would be contrary to the public interest." The permissible "public interest" denials provided for in § 10–618 are limited to an "interagency or intra-agency letter or memorandum that would not be available by law to a private party in litigation with the unit" (§ 10–618(b)), "examination information" (§ 10–618(c)), "details of a research project" (§ 10–618(d)), "a real estate appraisal" under some circumstances (§ 10–618(e)), records of investigations conducted by specified officials and certain other "investigatory file[s]" (§ 10–618(f)), and "information concerning the site-specific location of" specified plants, animals, or historic properties (§ 10–618(g)).

The records sought in the present case clearly do not fall into any of the categories encompassed by § 10–618, and the University does not argue otherwise. Consequently, the authority of a custodian to deny inspection based upon "the public interest," provided for in § 10–618, has no application to the records sought by *The Diamondback*.

The University, citing § 10–612 of the Maryland Public Information Act, asserts that disclosure of the student-athletes' parking ticket records would be "an unwarranted invasion of privacy" because it would subject the student-athletes and their families "to extreme embarrassment and humiliation." (Appellants' brief at 16–17).

■ When an adult commits or is formally charged with committing a criminal offense, even a petty one, it is doubtful

that any "invasion of privacy" occasioned by an accurate newspaper report of the matter is "unwarranted." Nevertheless, assuming *arguendo* that one might reasonably believe that such disclosure is an unwarranted invasion of privacy, the Maryland Public Information Act does not contain an exemption for particular cases whenever the disclosure of a record might cause an "unwarranted invasion of privacy." Section 10–612(b), previously quoted, relates to the "General Construction" of the Act. It provides that the Act "shall be construed in favor" of disclosure "unless an unwarranted invasion of the privacy of a person in interest would result." The statutory construction issues raised in the present case regarding the Maryland Public Information Act concern the meaning of the terms "personnel records" and "financial information." As explained in Parts II A and II B above, the records sought in the present case do not constitute personnel records or financial information. Furthermore, we do not believe that a broader definition of these terms would be justified under the statutory construction principles set forth in § 10–612(b).

Neither the language of the Public Information Act nor the policy underlying the statute supports the University's arguments that the requested documents are exempt from disclosure.

### III.

The University's principal argument is that the federal Family Educational Rights and Privacy Act precludes disclosure of the requested records that involve the student-athletes, and, accordingly, § 10–615 of the Maryland Public Information Act exempts them from disclosure. Section 10–615 of the Maryland statute provides:

"A custodian shall deny inspection of a public record or any part of a public record if:

(1) by law, the public record is privileged or confidential; or

(2) the inspection would be contrary to:

(i) a State statute;

(ii) a federal statute or a regulation that is issued under the statute and has the force of law;

(iii) the rules adopted by the Court of Appeals; or

(iv) an order of a court of record."

The Family Educational Rights and Privacy Act states that federal funds will be withheld from any university that has a "policy or practice of permitting the release of education records." 20 U.S.C. § 1232g. The Act defines education records as "those records ... which (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A).

 In applying the statute's somewhat broad definition of education records, it is important to keep in mind what Congress intended to accomplish by the above-cited provision of the. Family Educational Rights and Privacy Act. The provision is part of an amendment which was sponsored by Senator Buckley, and is often called the "Buckley Amendment." The sponsor's explanation of the provision discloses an intent to ensure that students and their parents had access to education records, as well as an intent to stop the widespread dissemination of education records to others. 120 Cong.Rec. 39862 (1974). *See also Zaal v. State,* 326 Md. 54, 68–73, 602 A.2d 1247, 1254–1256 (1992), where Judge Bell for the Court discussed in detail the purposes and scope of the Buckley Amendment. Congress was concerned about students being required to participate in medical research and experimental educational programs without parental notification or permission. 120 Cong.Rec. 13951 (1974). It wanted to "take the lid off secrecy in our schools." 120 Cong.Rec. 13952 (1974). At the same time, Congress was greatly concerned with the systematic violation of students' privacy. 120 Cong. Rec. 13951 (1974); *Zaal v. State, supra,* 326 Md. at 71, 602 A.2d at 1255 (the statute " 'was adopted to address systematic, not individual, violations of students' privacy and confidentiality rights through unauthorized releases of sensitive educational records,' " quoting *Smith v. Duquesne University,* 612

F.Supp. 72, 80 (W.D.Pa.1985)). Specifically mentioned by the sponsor of the legislation was the access that the FBI, CIA, juvenile courts, health department officials, and local police departments had to education records. *Ibid.* Furthermore, Congress found that much of this student information was disseminated to other governmental agencies. *Ibid.* The types of information or education records that were mentioned on the floor of Congress include student IQ scores, medical records, grades, anecdotal comments about students by teachers, personality rating profiles, reports on interviews with parents, psychological reports, reports on teacher-pupil or counselor-pupil contacts and government-financed classroom questionnaires on personal life, attitudes toward home, family and friends. *See* 120 Cong.Rec. at 13951–13954, 14584–14585.

 The legislative history of the Family Educational Rights and Privacy Act indicates that the statute was not intended to preclude the release of any record simply because the record contained the name of a student. The federal statute was obviously intended to keep private those aspects of a student's educational life that relate to academic matters or status as a student. Nevertheless, in addition to protecting the privacy of students, Congress intended to prevent educational institutions from operating in secrecy. Prohibiting disclosure of any document containing a student's name would allow universities to operate in secret, which would be contrary to one of the policies behind the Family Educational Rights and Privacy Act. Universities could refuse to release information about criminal activity on campus if students were involved, claiming that this information constituted education records, thus keeping very important information from other students, their parents, public officials, and the public.

Several courts have taken the position that records similar to those involved in the present case are not education records within the meaning of the federal Family Educational Rights and Privacy Act. Thus, in *Red & Black Pub. v. Board of Regents,* 262 Ga. 848, 427 S.E.2d 257 (1993), a student newspaper of the University of Georgia sought access to records of

the University's "student Organization Court." The student court was empowered to impose sanctions upon students, sororities and fraternities for "damage to property, disorderly conduct, alcohol and drug misuse, unauthorized entry, gambling, and hazing." 262 Ga. at 849, 427 S.E.2d at 260. The specific records sought by the newspaper concerned hazing charges against fraternities. The Supreme Court of Georgia, in holding that the records sought were not education records under the federal Family Educational Rights and Privacy Act, stated (262 Ga. at 851–852, 427 S.E.2d at 261):

> "[W]e do not believe the documents sought are 'education records' within the meaning of the Buckley Amendment. ... While the records in question are similar to, they are not the same as, those 'maintained solely for law enforcement purposes,' which are expressly excluded from the Buckley Amendment's purview.... Nevertheless, the records are not of the type the Buckley Amendment is intended to protect, i.e., those relating to individual student academic performance, financial aid, or scholastic probation ... Further, as noted by the trial court, the Organization Court records are maintained at the Registrar's Office."

The Supreme Court of Ohio's decision in *The Miami Student v. Miami University,* 79 Ohio St.3d 168, 680 N.E.2d 956, *cert. denied,* —— U.S. ——, 118 S.Ct. 616, 139 L.Ed.2d 502 (1997), involved a student newspaper's request for records of the "University Disciplinary Board," which dealt with infractions by students of such things as "underage drinking" and "criminal ... physical and sexual assault offenses, which may or may not be turned over to local law enforcement agencies." 79 Ohio St.3d at 171, 680 N.E.2d at 959. The Court held that such records "are not 'education records' as defined in FERPA [Family Educational Rights and Privacy Act]" because the disciplinary board proceedings "are nonacademic in nature" and "do not contain educationally related information, such as grades or other academic data, and are unrelated to academic performance, financial aid, or scholastic performance." 79 Ohio St.3d at 171–172, 680 N.E.2d at 959.

The United States District Court for the Western District of Missouri, in *Bauer v. Kincaid,* 759 F.Supp. 575 (W.D.Mo. 1991), held that campus criminal investigation and incident reports maintained by the university's "Safety and Security Department," and sought by a university newspaper, were not "education records" within the meaning of the federal statute. The court explained (759 F.Supp. at 591):

"[C]riminal investigation and incident reports are not educational records because, although they may contain names and other personally identifiable information, such records relate in no way whatsoever to the type of records which FERPA expressly protects; i.e., records relating to individual student academic performance, financial aid or scholastic probation which are kept in individual student files. These records are quite appropriately required to be kept confidential."

 In the present case, both the University and the United States as *amicus curiae* rely on *Belanger v. Nashua, New Hampshire, School District,* 856 F.Supp. 40 (D.N.H. 1994). That case involved the request for records by a parent of a 16 year old educationally disabled student. The defendant local public school district had obtained a juvenile court order placing the student in a residential education facility in another state. The student's parent, believing that the educational placement was inappropriate, sought from the school district, and from a member of the team of officials that had evaluated the student's educational plan and educational placement, records relating to the court order and the placement in the school in another state. The parent claimed, *inter alia,* that the records were "education records" within the meaning of the Family Educational Rights and Privacy Act, and that the federal statute gave a parent access to such records. In agreeing that the records were education records, the *Belanger* court pointed out that the defendants relied on *Bauer v. Kincaid, supra,* 759 F.Supp. 575. Instead of disagreeing with *Bauer,* however, the court in *Belanger* distinguished it, stating that the records involved in *Bauer* "were not the 'type of information created in the natural course of an individual's

status as a student,'" and were of a type excluded from the federal statute. *Belanger,* 856 F.Supp. at 50. The *Belanger* court went on to point out that

> "the plaintiff in *Bauer* was a third party who would not normally be allowed access to education records under FERPA. In this case, the party seeking access is the student's parent, an authorized party under FERPA. *See* 20 U.S.C.A. § 1232g."

The court in *Belanger* concluded that the records sought by the parent "have a direct bearing on" the student's "educational plan." *Ibid.*

The records involved in the *Belanger* case were clearly education records, directly concerned with which school and education plan would be best for the student. The records involved in the case at bar, however, are much more similar to those involved in the other cases discussed above. In light of the above-cited cases interpreting the federal statute, and the legislative history of the statute, we hold that "education records" within the meaning of the Family Educational Rights and Privacy Act do not include records of parking tickets or correspondence between the NCAA and the University regarding a student-athlete accepting a loan to pay parking tickets.

*The Diamondback* alternatively argues that, if the records relating to student-athletes' parking tickets were deemed to be education records within the meaning of the Family Educational Rights and Privacy Act, then they would fall within an exception in the federal statute for law enforcement records. The exception for education records which are also law enforcement records, contained in 20 U.S.C. § 1232g(a)(4)(B)(ii), however, is somewhat narrow. *See Student Press Law Center v. Alexander,* 778 F.Supp. 1227, 1228–1229 (D.D.C.1991). *But cf. Bauer v. Kincaid, supra,* 759 F.Supp. at 590–591. We need not in the present case express any view as to the scope of the law enforcement records exception because of our decision that the records sought in the case at bar do not constitute education records within the meaning of the federal statute.

Another alternative argument made by The *Diamondback* is that the federal Family Educational Rights and Privacy Act does not directly prohibit the disclosure of protected education records, that the only enforcement mechanism under the Act is the withholding of funds from institutions having "a policy or practice of permitting the release of education records," 20 U.S.C. § 1232g(b)(1), and that, consequently, the education records protected by the federal statute do not meet a requirement for nondisclosure contained in § 10–615(2) of the Maryland Public Information Act. As quoted earlier, § 10–615(2)(ii) requires a custodian of a public record to deny inspection if, *inter alia*, "the inspection would be contrary to ... a federal statute. . . ." *The Diamondback* contends that disclosure of an education record would not be contrary to the Family Educational Rights and Privacy Act because the federal enactment does not directly prohibit the disclosure of such records. Again, in light of our holding that the records are not education records within the meaning of the federal statute, we need not and do not reach this issue.

## IV.

In its cross-appeal, *The Diamondback* contends that the trial judge erred in not awarding counsel fees to *The Diamondback*. Section 10–623(f) of the Maryland Public Information Act states as follows (emphasis added):

> "*Costs.*—If the court determines that the complainant has substantially prevailed, the court *may* assess against a defendant governmental unit reasonable counsel fees and other litigation costs that the complainant reasonably incurred."

As the plain language of the statute makes clear, a condition for an award of counsel fees is that the complainant substantially prevail. *See Attorney Griev. v. A.S. Abell Co.*, 294 Md. 680, 689, 452 A.2d 656, 660 (1982). When this condition is met, the trial court "may" award counsel fees. Consequently, the award of counsel fees to a prevailing complainant is within the

discretion of the trial court. The statute itself contains no criteria for the exercise of this discretion.

■ In the present case, not only did *The Diamondback* "substantially prevail" but the student newspaper completely prevailed with respect to the records which it sought. Thus, the only issue before us is whether the trial court abused its discretion in declining to award counsel fees.

■ The Court of Special Appeals in *Kline v. Fuller*, 64 Md.App. 375, 496 A.2d 325 (1985), after reviewing legislative history under the federal Freedom of Information Act and case-law elsewhere under similar statutory provisions, listed three important considerations in determining whether counsel fees should be awarded, although the court made it clear that the list was not intended to be exhaustive. The Court of Special Appeals thus stated (64 Md.App. at 386, 496 A.2d at 331):

> "These considerations, which are not intended to be exhaustive, include:
>
> (1) the benefit to the public, if any, derived from the suit;
>
> (2) the nature of the complainant's interest in the released information; and
>
> (3) whether the agency's withholding of the information had a reasonable basis in law."

We agree with the Court of Special Appeals that the above considerations are very pertinent although not exclusive.

As discussed previously, we believe that there is a public benefit resulting from *The Diamondback*'s legal action, particularly in view of the purposes and policies of the Maryland Public Information Act. Moreover, *The Diamondback*, as a campus newspaper, obviously had an interest in the released information.

On the other hand, the University's withholding of the information was not entirely unjustified. The definition of the term "education records" in the federal Family Educational Rights and Privacy Act is broad and, literally, could be construed to encompass the records here involved. There

have been no prior reported Maryland cases dealing with the particular issues here. Moreover, there is not very much case-law elsewhere concerning the meaning of "education records" in the federal statute and the issue of public access to records of the type here involved. Furthermore, the federal agency which administers the federal statute supported the University as to some of the records involved. Under these circumstances, the University's position was not wholly unwarranted.

We cannot conclude, therefore, that the trial court abused its discretion in declining to award counsel fees.

*JUDGMENT AFFIRMED. APPELLANTS TO PAY COSTS.*