Dear Honorable James S. Grimes
You have asked for our opinion concerning the effect of several provisions of State law on the operation of a proposed citizen police review and advisory board in the City of Frederick. Specifically, you asked whether the proposed ordinance governing that board would be consistent with the Law Enforcement Officers' Bill of Rights ("LEOBR"), the Public Information Act, and the Open Meetings Act. You also provided a letter from the City Attorney describing some of these concerns.[1]
For the reasons set forth below, we believe that the proposed ordinance can be construed and administered in harmony with the LEOBR. However, we agree with the City Attorney's assessment that the Open Meetings Act and the Public Information Act preclude the degree of confidentiality for records and proceedings of the board that the drafters of the proposed ordinance apparently envisioned. The desired degree of confidentiality could be accomplished if the General Assembly were to enact legislation authorizing municipalities to establish police review boards and prescribing that records and proceedings of those boards remain confidential.
 I
Background
Last year you appointed a five-member Police Advisory Task Force ("Task Force") to consider possible ways to establish citizen oversight of the Frederick City Police Department. The Task Force has proposed the creation of a Citizen Police Review and Advisory Board ("Review Board"). As we understand it, the Review Board would consist of nine private citizens, who would be appointed and confirmed by the Mayor and Board of Aldermen of the City of Frederick. The function and operation of the Review Board are described in a draft ordinance prepared by the Task Force.[2]
Under the proposed ordinance, an individual would be able to file, on a standard complaint form, a complaint alleging abusive language, harassment, excessive use of force, or other misconduct by a police officer. The complaint could be filed within 90 days after the alleged incident with the Mayor's Office, the City Attorney, a police station, or the Professional Standards Unit ("PSU")) the internal investigations unit of the Police Department. Copies of the complaint would be sent within 48 hours to the Review Board and the PSU. § 2.04.
After receiving the complaint, the Review Board could elect to conduct a preliminary inquiry, which would be completed within 15 working days. If the preliminary inquiry failed to establish reason to believe that misconduct had occurred, then the Review Board would terminate its inquiry and inform the complainant, the accused officer, and the Chief of Police. § 2.05(1).
The draft ordinance directs the PSU to undertake a comprehensive investigation of the allegations in each complaint.[3] Within 90 days after the complaint, the PSU would submit a "summary descriptive report" of its investigation to the Review Board "without revealing any confidential information that would place the report in conflict with other law." § 2.05(2).
Simultaneously, the Review Board could undertake its own investigation and share its findings with the PSU. § 2.05(3). For this purpose, the Review Board could employ the services of an independent investigator. § 2.05(5). As part of the investigation, the proposed ordinance authorizes the Review Board to hold a hearing and to take voluntary testimony from the complainant, the accused officer, and any witnesses. § 2.05(4). The ordinance would afford the officer a right to attend the hearing, in person or by counsel, and to question witnesses at the hearing. Id. The draft ordinance requires that testimony be recorded and provides that "all proceedings before the Board shall be confidential." Id.
After considering the information provided by the PSU, the results of its own investigation, and the testimony at the hearing, the Review Board would make a recommendation to the Mayor and Board of Aldermen. If the Review Board "sustained" the complaint, it would report its findings and reasons, and could recommend training, administrative or policy actions to address its findings. However, the Mayor and Board of Aldermen would ultimately determine what action, if any, to take as a result of those findings. Alternatively, the Review Board could "not sustain" the complaint, exonerate the officer, or suggest further investigation. § 2.05(6).
The proposed ordinance explicitly attempts to reconcile the Review Board process with the rights of police officers under the LEOBR. In precatory language in one of its initial sections, the proposed ordinance states that LEOBR procedures are to be used when any law enforcement officer is subject to investigation or interrogation that could result in disciplinary action, demotion, or dismissal. § 1.01(b). In addition, another section of the proposed ordinance states that the procedures established in the ordinance are not to be construed to abrogate any constitutional, statutory, or common law right of the accused police officer or of the complainant or other participants in the Review Board process. § 2.06(1). The proposed ordinance states that it is not to be construed to change the procedures for suspension, dismissal, or discipline of an officer. § 2.06(2).
The proposed ordinance also attempts to preserve the confidentiality of records and information related to the Review Board's activities. The section of the proposed ordinance governing investigations provides that "all proceedings before the Board shall be confidential." § 2.05(4). A separate section entitled "Confidentiality" states that records containing the names or identification of complainants, investigators and witnesses may not be disclosed to the public. § 2.07(1). That section provides that the PSU shall have sole custody of "the PSU report";[4] it designates the Review Board as the custodian of other records related to its proceedings. § 2.07(2). The same section reiterates that "[a]ll such proceedings and information is confidential." Id.
These confidentiality provisions are broadly phrased. However, it is unclear whether the drafters of the ordinance contemplated that the Review Board's determination that a complaint was "sustained" or "not sustained" would remain confidential. It seems even less likely that the Review Board's recommendations to the Mayor and Board of Aldermen concerning training, administration, and policies of the police department would remain confidential. Such recommendations could be appropriate subjects of public debate.
Under the proposed ordinance, the Review Board would be required to periodically review the Police Department's "use of force" reports and to recommend any operational, training, administrative, or policy actions it deemed appropriate based on those reviews. § 2.08(4). The Review Board would also make semi-annual statistical reports to the Police Chief and to the Mayor and Board of Aldermen on complaints that it considered. § 2.08(2)-(3). Finally, the Review Board would adopt reasonable bylaws and policies to govern its procedures, subject to provisions of the proposed ordinance. § 2.08(1).
 II
Relation to Law Enforcement Officers' Bill of Rights
One of the concerns raised in your letter relates to interaction of the Review Board process and the LEOBR. In our view, the proposed ordinance does not necessarily conflict with the LEOBR.
A. LEOBR
The LEOBR, codified at Annotated Code of Maryland, Article 27, §§ 727-734D, provides detailed procedural safeguards for the investigation and adjudication of complaints that could result in disciplinary action against law enforcement officers within its purview.[5]
78 Opinions of the Attorney General 257, 261 (1993). "The legislative scheme of the LEOBR is simply this: Any law enforcement officer covered by the Act is entitled to its protections during any inquiry into his conduct which could lead to the imposition of disciplinary action." DiGrazia v. County Executive, 288 Md. 437, 452,418 A.2d 1191 (1980). A police officer in a municipal police department, such as the Frederick Police Department, is covered by the LEOBR. Article 27, § 727(b)(5).
The LEOBR does not apply to management decisions that are not punitive in nature. See, e.g., Calhoun v. Commissioner,103 Md. App. 660, 654 A.2d 905 (1995) (reassignment of drug unit officers based on results of polygraph examinations not punitive in nature); Montgomery County Dep't of Police v. Lumpkin,51 Md. App. 557, 567, 444 A.2d 469, cert. denied, 294 Md. 142 (1982) (reassignment involving loss of pay from special enforcement unit based on productivity not punitive in nature).
The LEOBR sets specific parameters for the interrogation of an accused officer, the conduct of an administrative hearing by a law enforcement agency, and the imposition of discipline or punitive measures. For example, the statute regulates the time, place, and manner in which an officer may be questioned. Article 27, § 728(b)(1)-(3), (6). Prior to any interrogation, the officer is entitled to written notice of the nature of the investigation[6]
and, in certain circumstances, formal advice of "all his rights." Article 27, § 728(b)(5), (9). The statute requires that the interrogation be delayed, if necessary, to permit the officer to obtain counsel or "any other responsible representative of his choice" who is explicitly given a right to be present and to participate in the interrogation. Article 27, § 728(b)(10). A complete record of the interrogation must be made and provided to the officer. Article 27, § 728(b)(8).
If the investigation leads to a recommendation of disciplinary or punitive action, the officer has a right to an evidentiary hearing before a hearing board.[7] Article 27, § 730(a). A hearing board consists of at least three police officers, appointed by the police chief who have not been involved in the investigation of the accused officer; at least one of those officers must have the same rank as the accused officer.[8] Article 27, § 727(d). The officer is entitled to receive written notice of the charges, and the names of any witnesses, at least 10 days before the hearing. Article 27, § 728(b)(5). At the same time, the officer may obtain a copy of the investigatory file and any exculpatory evidence, subject to a confidentiality agreement. Id. The LEOBR provides the officer with various procedural rights related to the hearing, including the right to summons witnesses on the officer's behalf, to cross-examine adverse witnesses, and to submit rebuttal evidence. See Article 27, § 730(d) — (j).
Any decision by the hearing board must be in writing and accompanied by findings of fact. Article 27, § 731(a). If the hearing board finds that the officer is not guilty of the alleged conduct, the proceeding is terminated. However, if the allegations are sustained, the hearing board must reconvene to receive additional evidence, including the officer's past job performance and "other relevant information," before making a recommendation to the police chief. Id. The hearing board may then recommend to the police chief whatever punitive or disciplinary action it deems appropriate, including among other things, demotion, dismissal, transfer, loss of pay, or reassignment. Article 27, § 731(b).
The police chief may not issue a final decision without complying with the LEOBR procedures. Within 30 days after receiving the recommendation of the hearing board, the police chief must ordinarily review the board's findings, conclusions, and recommendations and issue a final order.[9]
Article 27, § 731(c). Before increasing any penalty recommended by the hearing board, the police chief must personally review the hearing board record, meet with the accused officer, and allow the officer to be heard, and state on the record the substantial evidence that supports the increased penalty. If the police chief considers any communication not included in the hearing board record, that information must be provided in writing to the officer at least 10 days before the meeting. Article 27, § 731(c). The police chief's decision is subject to judicial review. Article 27, § 732.
Subject to an exception not relevant here, the LEOBR "supersede[s] any State, county or municipal law, ordinance, or regulation that conflicts with the provisions of [the LEOBR], and any local legislation shall be preempted by the subject and material" of the LEOBR. Article 27, § 734B.
B. Compatibility of Proposed Ordinance with the LEOBR
As noted above, the drafters of the proposed ordinance envisioned a process that would assure a degree of citizen oversight of police conduct without compromising compliance with the LEOBR. In our view, they largely succeeded in achieving this goal. There are generally three areas where possible conflict with the LEOBR might result) the investigation of a complaint, the hearing and decisional process, and the confidentiality of records) each of which we address in turn.
1. LEOBR Restrictions on Interrogations and Investigations
"The procedural safeguards afforded to the officer during the official inquiry into his conduct constitute the heart of the [LEOBR's] protections." DiGrazia v. County Executive,288 Md. 437, 453, 418 A.2d 1191 (1980). Under the proposed Frederick ordinance, it appears that the primary, and perhaps sole, investigation of a complaint would be undertaken by the PSU, a part of the Frederick Police Department. To the extent that its investigation focused on an individual police officer and could result in disciplinary action against that officer, any investigation or interrogation by the PSU would clearly be governed by the LEOBR. See Article 27, § 728(b). Moreover, the proposed ordinance affirms that no disciplinary action may be taken against an officer, except in accordance with LEOBR procedures. See §§ 1.01(b), (g), and 2.06.
It is true that the proposed ordinance would also authorize the Review Board to undertake its own investigation of an incident that was the subject of a complaint. A previous opinion of this Office noted that the LEOBR does not foreclose the possibility of an investigation by an entity other than the officer's employer, although that opinion recognized that it is an "unsettled question . . . whether an entity that is not a law enforcement agency" may investigate an officer. 72 Opinions of the Attorney General 246, 251 (1987) (addressing relationship between LEOBR and investigatory powers of State Ethics Commission). Similarly, the Court of Appeals has acknowledged that it is an "interesting," but unsettled, question whether an entity that reviews complaints of misconduct by a police officer is subject to the restrictions of the LEOBR. Baltimore City Police Department v. Andrew, 318 Md. 3, 9 n. 2, 566 A.2d 755 (1989).
In any event, under the proposed ordinance, the Review Board would have no authority to impose or even recommend a disciplinary sanction against an individual officer. While the focus of an LEOBR proceeding is a disciplinary action, the focus of the Review Board is the department's overall management rather than the conduct of any individual officer.[10] In particular, if the Review Board sustains a complaint, it may recommend "operational, training, administrative or policy actions" to remedy the problems revealed by the complaint. § 2.05(6)(a). No punitive action may be taken against an individual officer without the full procedural protections afforded by the LEOBR. In addition, the ordinance makes it clear that an accused officer would not be compelled to participate in any investigation conducted by the Review Board independent of the PSU.[11] Thus, in the final analysis, we conclude that the draft ordinance does not conflict with the interrogation and investigation procedures in the LEOBR.
2. LEOBR Hearing and Disciplinary Procedures
Although the proposed Frederick ordinance permits an accused officer to participate in the Review Board's hearing on a complaint, it does not afford the officer the same notice and discovery rights conferred by the LEOBR. Nor does the ordinance provide the officer with an explicit right to present rebuttal evidence, or the power to summons witnesses on the officer's behalf. Moreover, a Review Board composed of citizen members is a very different entity from the hearing board, composed exclusively of law enforcement officers, contemplated in the LEOBR. Finally, although the two entities both may make findings and recommendations concerning an incident, they submit their conclusions to different officials for different purposes: the LEOBR hearing board either exonerates the officer or submits a recommendation to the police chief as to appropriate discipline. By contrast, the Review Board would submit its findings to the Mayor and Board of Aldermen, with recommendations for training, or for administrative and policy measures that those officials could take.
However, for the reasons discussed in the preceding section dealing with investigations, the existence of dual forums does not necessarily result in a conflict. As we have noted, an officer's participation before the Review Board is entirely voluntary, and no disciplinary action may be taken without an LEOBR proceeding. Presumably for these reasons, and to make clear the purpose of the Review Board process, the proposed ordinance requires that the Review Board submit its recommendations to the Mayor and Board of Aldermen, rather than to the police chief. Even if information developed by the Review Board were shared with the police department, the procedural protections required by the LEOBR would not be compromised.[12]
Thus, so long as the Review Board's proceedings were not improperly used to mete out discipline to individual officers, there would be no inevitable conflict between the draft ordinance and the hearing and discipline procedures in the LEOBR.
3. Confidentiality of Records under LEOBR
The proposed ordinance requires that the PSU submit to the Review Board a summary descriptive report of its internal investigation of the complaint — an investigation presumably conducted under the LEOBR — albeit "without revealing any confidential information that would place the report in conflict with other law." Does this directive to provide the report to the Review Board conflict with confidentiality provisions of the LEOBR?
The LEOBR provides that "[t]he law enforcement officer under investigation shall be furnished with a copy of the investigatory file and . . . exculpatory information . . . not less than 10 days before any hearing if the officer and the officer's representative agree . . . [t]o execute a confidentiality agreement with the law enforcement agency to not disclose any of the material contained in the record for any purpose other than to defend the officer. . . ." Article 27, § 728(b)(5)(iv). This provision limits "access to the internal investigation file to the affected officer, and then only to exculpatory information, and does not expressly provide access by anyone else." Robinson v. State, 354 Md. 287, 308, 730 A.2d 181 (1999). The provision demonstrates a "public interest in the confidentiality of investigations of police officers." Mayor City Council v. Maryland Committee Against the Gun Ban, 329 Md. 78, 95,617 A.2d 1040 (1993). The clear implication is that the investigatory file is ordinarily kept confidential.[13] Although these provisions protect an accused officer, there is also an obvious intent to safeguard the confidentiality that would otherwise apply to investigatory records of a police department,[14] as evidenced by the requirement that the officer execute a confidentiality agreement before obtaining the record.
Nothing in the LEOBR, however, prohibits a unit of a police department, such as the PSU, from providing a summary investigative report to another municipal agency in accordance with local law, particularly when that law requires the other agency to maintain the confidentiality of the report. Thus, in our view, the release of a summary report by the PSU to the Review Board would not conflict with the LEOBR.
 III Relation to Public Information Act
A. Application to Municipal Agencies
The Maryland Public Information Act ("PIA"), Annotated Code of Maryland, State Government Article ("SG"), §§ 10-611 through 10-628, grants the public a broad right of access to records that are in the possession of a local government agency. SG § 10-612(a); see also Bowen v. Davison, 135 Md. App. 152, 157,761 A.2d 1013 (2000). This right to inspect public records is subject to certain exemptions. For example, the PIA allows a custodian to deny access to certain categories of information if the custodian "believes that inspection of a part of a public record by the applicant would be contrary to the public interest." SG § 10-618. And, unless otherwise provided by law, the PIA requires the custodian to deny access to certain records and information. SG §§ 10-616 and 10-617. Likewise, the PIA requires that the custodian deny access to any part of a public record in a situation where inspection would be contrary to a State statute, a federal statute or regulation, a rule adopted by the Court of Appeals, or an order of a court of record, or where, by law, the public record is privileged or confidential. SG § 10-615.
The PIA applies to records of a "unit or instrumentality" of a municipality. SG §§ 10-601(2), 10-611(g). Thus, records of the PSU, which is part of the City's police department, are clearly within the purview of the PIA. Whether the PIA would encompass the Review Board's records would depend on whether the Board was a unit or instrumentality of local government. Despite the fact that the Review Board would be composed entirely of private citizens, it would be created pursuant to a City ordinance, it would perform a public function related to oversight of the City police department, and its budget and staff would be subject to the control of the City. Thus, in our view, it would be a unit or instrumentality of the City for purposes of the PIA. See, e.g., Andy's Ice Cream, Inc. v. City of Salisbury, 125 Md. App. 125,724 A.2d 717, cert. denied, 353 Md. 473, 727 A.2d 382 (1999) (municipal commission subject to PIA, given Mayor and City Council's role in appointment of members, City authority over budget and by-laws, and City's power to dissolve commission). Accordingly, records in the custody of the Review Board would be public records subject to disclosure under the PIA unless an exemption applied.
You asked that we address two issues concerning the relationship of the PIA to the proposed Review Board process. First, you asked whether the PSU's provision of records and information to the Review Board would violate PIA restrictions on the disclosure of those records. Second, you asked whether the confidentiality provisions in the proposed ordinance would be preempted by the PIA's general mandate in favor of access to public records. A preliminary issue relevant to both of those questions is whether a municipal ordinance is other "law" that affects application of the PIA to records of municipal agencies.
B. Whether the Ordinance Itself is "Other Law" for Purposes of the PIA
The proposed ordinance contains two provisions that purport to confer confidentiality on the Review Board's proceedings and records. Section 2.05(4) states that "all proceedings before the Board shall be confidential." In addition, § 2.07 provides, in part, that "[r]ecords containing the names or identification of complainants, investigators and witnesses may not be disclosed or released to the public; . . . [a]ll information [connected with the Review Board's proceedings] is confidential." The proposed ordinance also directs the PSU and the Review Board to share certain information with each other. § 2.05(2)-(3).
Do the confidentiality provisions of the ordinance constitute "other law" within the meaning of SG § 10-615 that would exempt Review Board records from the PIA's general rule of disclosure? Similarly, does the ordinance's directive to the PSU and the Review Board to share information mean that disclosure of records is "otherwise provided by law" for purposes of the PIA, regardless of any mandatory exemptions under the PIA?
In our opinion, a local ordinance does not constitute "other law" for purposes of SG § 10-615 and cannot by itself be the basis of an exemption from disclosure under the PIA. As we have previously explained, a contrary interpretation "would allow. . . local entities at their election to undermine the [PIA]. . . . [H]ad the General Assembly intended to give this effect to a . . . local ordinance, [local ordinances] would have been included in the list in SG § 10-615. . . ." Office of the Attorney General, Public Information Act Manual 15 (8th ed. 2000). See also 71 Opinions of the Attorney General 297, 299-300 (1986).
Similarly, if disclosure of a particular record is forbidden by the PIA, its disclosure would not be "otherwise provided by law" simply because the ordinance authorized the disclosure. Most of the mandatory exemptions in the PIA appear designed to vindicate privacy or other interests deemed worthy of protection by the General Assembly. If a local ordinance by itself constituted other "law" authorizing disclosure, it could thwart the sometimes delicate balance of interests struck by the Legislature.
Thus, to the extent that the proposed ordinance purports to create a blanket exemption from disclosure for Review Board records, it conflicts with provisions of the PIA. At best, it could be construed as an instruction to the members and staff of the Review Board to exercise whatever discretion the PIA might otherwise give them to preserve the confidentiality of these records. Similarly, the direction to the PSU to provide a report to the Review Board could only be carried out to the extent that it is consistent with the PIA.
C. Disclosure of PSU Records and Information to the Review Board
Your concern that the provision of information from PSU records to the Review Board would violate the PIA is apparently based on the premise that PSU records are "personnel records" of the officer who is the subject of a complaint. Under the PIA, a custodian of a personnel record is generally required to deny a request for inspection of such a record, unless the request is made by the person who is the subject of the record or by that individual's supervisor.[15]
The PIA does not define "personnel record," although the statute provides examples: applications, performance ratings, and scholastic achievement information. SG § 10-616(i)(1). "Although this list was probably not intended to be exhaustive, it does reflect a legislative intent that `personnel records' means those documents that directly pertain to employment and an employee's ability to perform a job." Kirwan v. The Diamondback, 352 Md. 74, 82-84, 721 A.2d 196 (1998). Moreover, the term "include[s] not only papers contained in the employee's official personnel file maintained by the official custodian, . . . but also papers relating to a personnel matter in the hands of an authorized custodian. . . ." 78 Opinions of the Attorney General 291, 294 (1993). Thus, this Office has previously concluded that the exemption prohibits a custodian from disclosing information concerning complaints of discrimination registered against employees of a court clerk's office to the complainant or a third person, such as a media representative. Id. As indicated in that opinion, "any exception to the general prohibition against public access to personnel records must be supported by a clear legal basis . . . as when `the requesting agency has statutory duties which demonstrably cannot be effectively executed without access . . . .'" Id. (citing 60 Opinions of the Attorney General 554, 559 (1975)).
While the personnel records exemption would likely prohibit the PSU from sharing information developed about a complaint with the complainant or third parties, it may not preclude the PSU from providing a summary report of its investigation to the Review Board in accordance with the proposed ordinance.[16] If the City were to adopt the ordinance, the Review Board would become part of the City's internal process for reviewing and responding to complaints alleging misconduct by its personnel. Although the Review Board lacks authority to take any type of disciplinary action, it is charged with making specific findings in connection with complaints. Based on its review, the Review Board may sustain a complaint, "not sustain" the complaint, exonerate the officer, or recommend further investigation. It is implicit in the personnel records exemption that a City agency charged under a municipal ordinance with responsibilities related to personnel administration have access to those records necessary to carry out its duties.
On the other hand, it might be argued that the proposed ordinance distinguishes the Review Board's function from what might typically be considered a personnel function. The Review Board would have no authority to impose or recommend discipline for individual officers; rather, it would make training and policy recommendations to the City's governing body concerning law enforcement personnel. This might well be characterized as an administrative advisory function rather than a personnel function. If the Review Board is not considered part of the City's personnel function, its inspection of PSU records would be subject to the Public Information Act. See SG § 10-614(a) (PIA governs requests by government units to inspect public records). As noted above, the authorization for inspection of the PSU report in the City ordinance would not constitute other "law" that would override the PIA's prohibition against disclosure of personnel records.
In our view, the PSU could reasonably provide a summary report to the Review Board without violating the PIA. However, this issue is not free from doubt.
D. Confidentiality of Review Board Records under the PIA
1. Status of Review Board Records Generally
The proposed ordinance states that the Review Board is to be the custodian of "all records of proceedings of a complaint . . . including personal notes, audio recordings, memoranda, letters and forms resulting from a complaint and proceedings before the Board involving the complaint" other than the PSU's summary report. § 2.07(2). If the Review Board received a request to review those records under the PIA, the Review Board would need to review the application of the PIA to the particular records requested. Most pertinent to that consideration would be the investigatory records exemption.[17]
The investigatory records exemption provides that a custodian of "an investigatory file compiled for any . . . law enforcement . . . purpose" may deny inspection of those records, if inspection would be contrary to the public interest. SG § 10-618(f)(1)(ii). Therefore, to withhold records under the investigatory files exemption, the Review Board would have the burden of demonstrating that the records requested were "investigatory files" that had been compiled for "law enforcement purposes" and that inspection would be contrary to the public interest. See Fioretti v. State Board of Dental Examiners, 351 Md. 66,716 A.2d 258 (1998). In addition, if those records were requested by a "person in interest" — i.e., a person who was the subject of the particular record — the Review Board could deny inspection only if it could demonstrate a specific harm of the type identified in the statute.[18]
Under the proposed ordinance, the Review Board is authorized to undertake its own investigation of a complaint. § 2.05(3). Records relating to such an investigation would plainly constitute "investigatory files." An initial question would be whether they had been compiled for "law enforcement purposes."
The term "law enforcement purposes" is not limited to criminal investigations, but applies to investigations precedent to civil and regulatory proceedings as well. Fioretti, 351 Md. at 82. However, a purely advisory body like the Review Board would have no authority to impose any form of sanctions or to initiate civil or regulatory proceedings; rather, it would only be empowered to make recommendations to the Mayor and Board of Aldermen.
No court decision answers the question whether an investigation by an advisory body is an investigation for "law enforcement purposes" under the PIA. Nor are we aware of any authority under the federal Freedom of Information Act addressing investigatory records of an advisory body. However, courts have interpreted "law enforcement purposes" under the federal statute to include investigations under both criminal and civil statutes as well as administrative or regulatory provisions. See, e.g., Center for Nat. Policy Review on Race Urban Issues v. Weinberger,502 F.2d 370 (D.C. Cir. 1974). In contrast, the federal exemption does not extend to routine internal monitoring or oversight of governmental activities, at least absent a specific allegation of an illegal act. See, e.g., Stern v. FBI, 737 F.2d 84 (D.C. Cir. 1984).
In our view, whether an investigation is for law enforcement purposes does not depend on the array of possible sanctions that could result from the investigation. Rather, the proper focus is whether the advisory body's investigatory function is part of an overall scheme designed to review specific instances of alleged improper conduct — as opposed to providing non-specific monitoring or oversight.
While the proposed Frederick ordinance authorizes the Review Board to make recommendations concerning training and administration of the police force, it also directs the Review Board to make findings regarding specific complaints. Following its review, the Review Board is to sustain a complaint, "not sustain" the complaint, exonerate the officer, or recommend further investigation. In effect, the Review Board could function as a preliminary screen of complaints regarding improprieties by police officers with the ultimate purpose of ensuring that the law is enforced. Indeed, the results of a Review Board investigation could conceivably lead to further investigation and a disciplinary proceeding against an officer under the LEOBR, or even to a criminal prosecution.
Thus, an argument can be made that many of the Review Board's records would be compiled for law enforcement purposes and thus would fall within the investigatory records exemption. However, there is little guidance in the case law on the merits of this argument and the conclusion that the Review Board records would be protected from disclosure under the investigatory records exemption. A court could reasonably reach a contrary result. Even if the Review Board's records could properly be characterized as "investigatory files," the Review Board would have only limited discretion to deny inspection of those records to a "person in interest") e.g., the officer who was the subject of the complaint. See footnote 18 above.
2. Status of PSU Summary Report
The proposed ordinance requires the PSU to provide the Review Board with a summary descriptive report of the PSU investigation, which the Review Board must consider in making its findings and recommendations.[19] The ordinance further provides that the "PSU shall retain sole custody of the PSU report." § 2.07(1). This provision is somewhat puzzling, as it is not clear how the Review Board is to give thoughtful consideration to the PSU summary report without taking possession of it for some period of time. Even if this provision is meant to designate the head of the PSU as the "official custodian" of the report,[20] a representative of the Review Board in possession of the report would also be a custodian of the report for purposes of the PIA. Simply put, if a member or agent of the Review Board has a copy of the report in his or her possession, that individual is a "custodian" of the report under the PIA.[21] The ordinance cannot alter that designation.
To analyze the status of the summary PSU report in the custody of the Review Board, we start with the status of that report in the custody of the PSU itself. There would likely be at least two bases on which the PSU could deny access to such a report: First, the summary investigative report would be a "record of investigation" conducted by a police department and therefore subject to the discretionary exemption for investigative records in SG § 10-618(f)(1). See Mayor City Council v. Maryland Committee Against the Gun Ban, 329 Md. 78,85, 617 A.2d 1040 (1993). Second, as noted in Part III.C. of this opinion, a record containing information developed in response to a complaint about a City employee for the purpose of determining possible disciplinary action might also be considered a "personnel record," exempt from disclosure under SG § 10-616(i).
In our view, even if the PSU would not be precluded from sharing its summary report with the Review Board, it does not follow that the report would be generally available for public inspection under the PIA. Disclosure of the report to the Review Board would not necessarily alter its status under the PIA. See, e.g., Attorney Grievance Commission v. A.S. Abell Co., 294 Md. 680,452 A.2d 656 (1982) (court rule allowing disclosure of certain information to complainants concerning disposition of their complaints does not make the information subject to general disclosure under the PIA). In analogous situations under the federal Freedom of Information Act,[22] federal courts have held that, while a voluntary disclosure by a government agency to a third party may waive an exemption under the Freedom of Information Act, the sharing of investigatory information among agencies does not necessarily constitute a waiver. See, e.g., Chilivis v. SEC, 673 F.2d 1205, 1211-12 (11th Cir. 1982) (agency does not automatically waive exemption by releasing documents to other agencies); Kansi v. U.S. Department of Justice,11 F. Supp.2d 42, 45 (D.D.C. 1998) (disclosure by federal law enforcement agency to state prosecutor not a waiver).
Thus, a reasonable argument can be made that the summary report of the PSU investigation, even if it were shared with the Review Board, would retain its status as a personnel record or record of investigation in the hands of the PSU. That argument can be extended to include a copy of the report in the hands of the Review Board. In other words, the Review Board would be standing in the place of the PSU in relying on the personnel or investigatory records exemption. However, the Review Board would have the burden of demonstrating that the report fell within the applicable exemption and, in the case of the investigatory records exemption, that disclosure "would be contrary to the public interest." See Part III.D.1. of this opinion.
3. Summary
If confronted with a request for access to its records, the Review Board might be able to invoke the investigatory records exemption and perhaps, with respect to the PSU summary report, the personnel records exemption to deny access. However, the application of those exemptions to records in the custody of an advisory body like the Review Board is not free from doubt.
 IV Relation to Open Meetings Act
You have asked whether the proposed Frederick ordinance conflicts with the State Open Meetings Act, SG § 10-501 et seq. The proposed ordinance provides that all of the Review Board's proceedings are confidential. § 2.07(2). However, just as the proposed ordinance cannot override the requirements of the Public Information Act, it cannot avoid the application of the Open Meetings Act.
The Act requires that, "[e]xcept as otherwise provided [under the Act,] a public body shall meet in open session." SG § 10-505. The Act defines a "public body" to include "an entity that . . . consists of at least 2 individuals; and . . . is created by . . . an ordinance." SG § 10-502(h). Because the Review Board would be established by ordinance, it would be a "public body" for purposes of the Open Meetings Act. Application of the Act would therefore have to be considered whenever a quorum of the Review Board "convene[d] . . . for the consideration . . . of public business." SG § 10-502(g).
Certain functions performed by public bodies are excluded from the scope of the Open Meetings Act; only one of those excluded functions — "executive function" — possibly pertains to the Review Board. SG § 10-503.[23] The Act defines "executive function" in pertinent part as follows:
(1) "Executive function" means the administration of:
(i) a law of the State;
(ii) a law of a political subdivision of the State; or
(iii) a rule, regulation, or bylaw of a public body.
(2) "Executive function" does not include:
(i) an advisory function. . . .
SG § 10-502(d). As the Open Meetings Compliance Board has explained on several occasions:
The term "executive function" is in part defined by what it is not: a discussion of an advisory, judicial, legislative, quasi-judicial, or quasi-legislative function is not an executive function. If a discussion is not encompassed by any of these other defined functions and involves "the administration of" existing law, it falls within the executive function.
Compliance Board Opinion 00-12 (November 8, 2000), slip op. at p. 4 (citations omitted). See also 78 Opinions of the Attorney General 275 (1993); Office of the Attorney General, Open Meetings Act Manual at pp. 13-14 (4th ed. 2000). Thus, to come within the term "executive function" exclusion, the discussion must (1) involve the administration of law and (2) not be encompassed by another function, e.g., "advisory function." Unless both inquiries can be answered in the affirmative, the executive function exclusion does not apply.
The primary purpose of the Review Board under the proposed Frederick ordinance is to make certain recommendations to the Mayor and Board of Aldermen. The Open Meetings Act defines "advisory function" as:
the study of a matter of public concern or the making of recommendations on the matter, under a delegation of responsibility by:
(1) law;
(2) the Governor;
(3) the chief executive officer of a political subdivision of the State;
(4) formal action by or for a public body that exercises an executive, judicial, legislative, quasi-judicial, or quasi-legislative function.
SG § 10-502(b). In carrying out its primary purpose under the proposed ordinance, the Review Board would ordinarily be engaged in an advisory function, and by definition, its actions would therefore not constitute an executive function.[24] SG § 10-502(b). Thus, the Act would require that meetings of the Review Board ordinarily be open.
Nevertheless, a public body subject to the substantive and procedural requirements of the Open Meetings Act may meet in closed session in certain circumstances. The Act enumerates 14 grounds under which a public body may meet in a closed session after complying with certain procedural requirements. SG § 10-508(a). The Review Board might be justified in conducting a closed session for one of those reasons. For example, the Act permits a public body to close a meeting to discuss a "personnel matter that affects 1 or more specific individuals," SG § 10-508(a)(1)(ii); to "protect the privacy or reputation of individuals with respect to a matter that is not related to public business," SG § 10-508(a)(2); to "consult with counsel to obtain legal advice," SG § 10-508(a)(7); to "consult with staff, consultants, or other individuals about pending or potential litigation," SG § 10-508(a)(8); and to "conduct or discuss an investigative proceeding on actual or possible criminal conduct," SG § 10-508(a)(12). However, the Review Board would need to evaluate the grounds for closing each meeting or portion of a meeting and would be required to comply with the procedural requirements of the Act.
In summary, the City cannot close Review Board meetings simply by declaring in the ordinance that the Review Board's proceedings are confidential. To the extent that the ordinance is inconsistent with the Open Meetings Act, the Act prevails and the Review Board proceedings must be open. SG § 10-504 ("Whenever [the Open Meetings Act] and another law that relates to meetings of public bodies conflict, [the Open Meetings Act] applies unless the other law is more stringent").
 V Conclusion
The drafters of the proposed Frederick ordinance faced the exceedingly difficult task of accommodating an advisory civilian review board to the procedural safeguards of the LEOBR and the mandate for open government embodied in the PIA and the Open Meetings Act. In our opinion, the proposed Review Board process can be structured to avoid compromising an officer's rights under the LEOBR. However, the proposed ordinance makes a comprehensive promise of confidentiality that, despite the best intentions of the drafters, cannot always be kept if the Review Board is to comply, as it must, with the PIA and the Open Meetings Act. Rather, the application of the PIA and the Open Meetings Act would need to be considered in connection with each record and meeting, respectively.
Finally, we note that, if the City believes that the desired measure of confidentiality cannot be assured, given the requirements of the PIA and Open Meetings Act, it may wish to seek enactment of State legislation addressing its concerns. The City could ask the General Assembly to enact a public general law granting specific authority to municipalities to establish citizen review boards and specifying the parameters under which the records of those boards would be disclosed and a board's proceedings would be open or closed to the public. Such legislation could attempt to balance competing policy considerations concerning the efficient administration of law enforcement agencies, the due process rights of accused police officers, and the interest of the general public in open government.
J. Joseph Curran, Jr. Attorney General
William R. Varga Assistant Attorney General
Robert N. McDonald Chief Counsel Opinions Advice
[1] In addition to the questions you raised, the City Attorney also expressed concern about potential conflicts that might arise if her office were to represent both the police department and the proposed review board. We do not address this issue, in part because we are not presented with a specific factual situation involving a conflict. We note that, if an irreconcilable conflict did arise, the City might need to employ outside counsel, an option recognized in the municipal charter. Frederick City Charter, § 124(h).
[2] As indicated in the Task Force report and the letter of the City Attorney, the Task Force looked to examples of local police review boards in Baltimore City and Prince George's County, as well as in other states. Although the review board proposed by the Task Force bears some similarity to the existing local review boards in Maryland, there are also significant differences. For example, the Baltimore City Police Department is considered a State agency, and the Civilian Review Board in Baltimore City was established by the General Assembly; the law creating that Board thus avoids questions about possible preemption of local law. On the other hand, the Prince George's County Citizen Complaint Oversight Panel was established by local ordinance. However, unlike the review board contemplated under the proposed Frederick ordinance, the Prince George's Panel has no independent investigative authority. Because of these significant differences, our analysis is limited to the ordinance that the Frederick Task Force proposed.
[3] The proposed ordinance is not clear as to whether the PSU is to conduct such an investigation if the Review Board has conducted a "preliminary inquiry" under § 2.05(1) and found no reason to believe that misconduct had occurred. If the Review Board has terminated its inquiry for that reason, then presumably there would be no need for the PSU to conduct further investigation. On the other hand, § 2.05(2) states that the PSU is to make a comprehensive investigation of "each complaint" (emphasis added).
[4] This reference to "the PSU report" is not entirely clear. In an earlier provision, the proposed ordinance mentions two reports generated by the PSU: an "internal investigative report" and a "summary descriptive report" of the former report. § 2.05(2). We infer that the "PSU Report" that § 2.07(2) relegates to the sole custody of the PSU is the summary descriptive report; the PSU's internal investigative report is never submitted to the Review Board and there would be no need to designate the PSU as its custodian.
[5] The LEOBR defines "law enforcement officer" to include any person authorized to make arrests in an official capacity if that person belongs to one of a list of law enforcement agencies. Article 27, § 727(b). Excluded from the definition are any officer "serving at the pleasure of the Police Commissioner of Baltimore City or the appointing authority of a charter county," the police chief of a municipal police department, and, except in a case involving allegations of brutality, a new officer during the officer's probationary status. Article 27, § 727(c).
[6] A police department is obligated to investigate a complaint alleging brutality only if the complaint is filed within 90 days after the incident and only if the aggrieved person, a member of that person's immediate family, or a person with personal knowledge of the incident swears to the complaint. Article 27, § 728(b)(4). See Baltimore City Police Department v. Andrew,318 Md. 3, 11-13, 566 A.2d 755 (1989).
[7] There are exceptions for summary punishments and emergency suspensions in certain circumstances. See Article 27, § 734A. In addition, a hearing is not required if the officer has been convicted of a felony. Article 27, § 730(c).
[8] In certain circumstances, the process for forming a hearing board may be varied pursuant to a collective bargaining agreement. See Article 27, § 727(d)(2).
[9] Under certain circumstances, the chief does not receive a recommendation and the decision of the hearing board is final. See Article 27, § 731(d).
[10] There is some potential for confusion on this point. The proposed ordinance requires the Review Board to "exonerate" the officer, "sustain" the complaint, "not sustain" the complaint, or call for additional investigation. § 2.05(6). That language is similar to terminology used to describe the potential disposition of an investigation conducted by the internal affairs unit of a police department under the LEOBR. See, e.g., Mayor and City Council v. Maryland Committee Against the Gun Ban, 329 Md. 78, 85,617 A.2d 1040 (1993).
[11] Section 2.05(4) of the proposed ordinance provides: In furtherance of its investigation, the Board, in its discretion, may conduct a hearing to obtain information including testimony, provided voluntarily by the Complainant, other witnesses and, the accused officer, if any of the foregoing choose to participate. Invitations to the hearing shall be provided by the Board to the Complainant, any witnesses who have been identified and the accused officer. The accused officer, if he chooses, shall be entitled to attend the hearing in person and/or by counsel. The accused officer or the accused officer's representative shall have the right to question witnesses who testify about the Complaint. All witnessed testimony shall be recorded and all proceedings before the Board shall be confidential.
(emphasis supplied).
[12] If the police chief were to consider information developed by the Review Board in addition to the LEOBR hearing board's recommendations, that factor alone would not result in a conflict. However, if the police chief were to impose sanctions beyond any recommended by the hearing board, the police chief would have to comply with the procedures of the LEOBR. See Article 27, § 731(c). See also Vandevander v. Voorhaar,136 Md. App. 621, 767 A.2d 339 (2001).
[13] Other constitutional and statutory requirements may require disclosure of investigatory materials, including materials created during an internal police investigation that would otherwise remain confidential. See Robinson v. State,354 Md. 287, 730 A.2d 181 (1999) (holding that criminal defendant's due process and confrontation rights required production of officers' statements to Internal Affairs Division for cross-examination purposes in a criminal proceeding).
[14] See Annotated Code of Maryland, State Government Article, § 10-618(f); Mayor City Council v. Maryland Committee Against the Gun Ban, 329 Md. 78, 617 A.2d 1040 (1993).
[15] The personnel records exemption reads:
(1) Subject to paragraph (2) of this subsection, a custodian shall deny inspection of a personnel record of an individual, including an application, performance rating, or scholastic achievement information.
(2) A custodian shall permit inspection by: (i) the person in interest; or (ii) an elected or appointed official who supervises the work of the individual.
SG § 10-616(i). A "person in interest" includes "a person or governmental unit that is the subject of a public record or a designee of the person or governmental unit." SG § 10-611(e).
[16] Under the proposed ordinance, the summary report is not to "[reveal] any confidential information that would place the report in conflict with other law." § 2.05(2). However, the drafters of the proposed ordinance clearly did not intend that the report be so general as to preclude any meaningful review by the Review Board.
[17] Of course, other exemptions from disclosure under the PIA might apply to specific documents. For example, if the Review Board obtained medical information concerning an individual, that information would be exempt from disclosure to others. See SG § 10-617(b).
[18] The statute provides that:
A custodian may deny inspection by a person in interest only to the extent that the inspection would:
(i) interfere with a valid and proper law enforcement proceeding;
(ii) deprive another person of a right to a fair trial or an impartial adjudication;
(iii) constitute an unwarranted invasion of personal privacy;
(iv) disclose the identity of a confidential source;
(v) disclose an investigative technique or procedure;
(vi) prejudice an investigation; or
(vii) endanger the life or physical safety of an individual.
SG § 10-618(f)(2).
[19] As noted above, there is a question whether the PSU may do so in compliance with the PIA's proscription on disclosure of personnel records. See Part III.C. of this opinion.
[20] For purposes of the PIA, the "official custodian" is "an officer or employee . . . who, whether or not the officer or employee has physical custody and control of a public record, is responsible for keeping the public record." SG § 10-611(d). The term "public record" includes "any documentary material . . . made . . . or received by [a] unit or instrumentality [of State or local government] in connection with the transaction of public business. . . ." SG § 10-611(g).
[21] The PIA defines the term "custodian" to include "any . . . authorized individual who has physical custody and control of a public record." SG § 10-611(c).
[22] In interpreting the investigatory records exemption in the PIA, courts may obtain guidance from case law under a similar federal exemption. Faulk v. State's Attorney for Harford County,299 Md. 493, 474 A.2d 880 (1984).
[23] SG § 10-503 provides:
(a) Except as provided in subsection (b) of this section, this subtitle does not apply to:
(1) a public body when it is carrying out:
(i) an executive function;
(ii) a judicial function; or
(iii) a quasi-judicial function; or
(2) a chance encounter, social gathering, or other occasion that is not intended to circumvent this subtitle.
(b) The provisions of this subtitle apply to a public body when it is meeting to consider:
(1) granting a license or permit; or
(2) a special exception, variance, conditional use, zoning classification, the enforcement of any zoning law or regulation, or any other zoning matter.
The Review Board obviously does not perform a judicial function; moreover, its proceedings would not meet the Act's definition of a quasi-judicial function, because the proceedings would not be an administrative agency proceeding subject to judicial review. See § 10-502(e), (i).
[24] Of course, every matter undertaken at a Review Board meeting would not necessarily involve the Board in an "advisory function." For example, there might be situations where a particular action by the Review Board would constitute an executive function and the Act would not apply. See SG §§ 10-502(d) and 10-503(a)(1)(i); see also Office of the Maryland Attorney General, Open Meetings Act Manual 13 (4th ed. 2000). Furthermore, not all proceedings of the Review Board would necessarily constitute "meetings" under the Act. For example, if the chairman of the Review Board were to delegate responsibility to conduct a hearing to a single board member, that hearing would not constitute a "meeting" of the Review Board under the Act. SG § 10-502(g).
 *Page 120