18 A.3d 152

**Mary Katherine DAUGHTON**

v.

**MARYLAND AUTOMOBILE INSURANCE FUND.**

No. 2770, Sept. Term, 2009.

Court of Special Appeals of Maryland.

April 28, 2011.

John S. Spadaro, Hockessin, DE (Lawrence A. Melfa, Francomano, Butler, Melfa & Taylor PA, on the brief) Towson, MD, for appellant.

Samuel P. Piazza (Douglas F. Gansler, Atty. Gen., on the brief), Annapolis, MD, for appellee.

Panel: KRAUSER, C.J., EYLER, DEBORAH S., JAMES P. SALMON (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

In the Circuit Court for Baltimore County, Mary Katherine Daughton, the appellant, sued the Maryland Automobile Insurance Fund ("MAIF"), the appellee, for breach of contract and declaratory judgment, alleging 1) that it failed to pay her Personal Injury Protection ("PIP") benefit claim within 30

days, in violation of Md.Code (2006 Repl.Vol., 2010 Supp.) section 19–505 of the Insurance Article ("Ins."); and 2) that it then failed to pay interest on the late payment, in violation of Ins. section 19–508. Daughton's complaint sought class action certification, but the court never ruled on that issue.

MAIF moved for summary judgment, arguing, *inter alia,* that the claims against it were barred by Md.Code (2009 Repl.Vol., 2010 Supp.), section 12–202 of the State Government Article ("SG"). Specifically, MAIF asserted that it is an agency or instrumentality of the State and therefore enjoys sovereign immunity; that, under SG section 12–202, its sovereign immunity for breach of contract claims is waived only when suit is filed within one year; and that Daughton's action was filed outside that period.

The court held an evidentiary hearing on the sovereign immunity aspect of MAIF's summary judgment motion and, thereafter, in a thorough memorandum opinion and order, ruled in MAIF's favor on both of Daughton's claims.[1] This appeal followed.

Daughton raises three questions for review, all of which are arguments challenging the circuit court's decision to grant summary judgment to MAIF. As rephrased, they are:

I. Did the circuit court err in ruling that MAIF is an agency of state government that enjoys sovereign immunity when it engages in the business of automobile insurance?

II. Did the circuit court err in ruling that there is no implied private right of action arising under Ins. section 19–508 for the recovery of statutory interest?

III. Did the circuit court err by concluding that Daughton's claims were barred even though her insurance

---

1. MAIF had filed a counterclaim, but it 1 was rendered moot by the court's grant of summary judgment in favor of MAIF on Daughton's claims.

contract with MAIF was not "completed," within the meaning of SG section 12–202, when she filed suit? [2]

For the following reasons, we shall affirm the judgment of the circuit court.[3]

## LEGAL FRAMEWORK

### A. Creation and Operation of MAIF

In 1972, the General Assembly enacted a "sweeping overhaul" of the automobile insurance laws in Maryland. *GEICO v. Insurance Comm'r*, 273 Md. 467, 480, 330 A.2d 653 (1975); Laws of 1972, ch. 73. The new legislation required every owner of a motor vehicle registered in Maryland to maintain a liability insurance policy with specified minimum coverage. Laws of 1972, ch. 73. It simultaneously created MAIF. MAIF was established to, and still does, serve dual roles: (1) to act as the insurance carrier of last resort for drivers unable to obtain motor vehicle liability insurance in the private market; and (2) to act as a successor to the Unsatisfied Claim and Judgment Fund ("UCJF").[4] In this case, our focus is on MAIF"s role as the insurance carrier of last resort.

---

**2.** As phrased by Daughton, the questions presented are:

    1. Did the Circuit Court err in concluding that MAIF acts as an agency of state government (and so is entitled to sovereign immunity) when it engages in the business of auto insurance?

    2. Did the Circuit Court err in holding, under *Cort v. Ash*, 422 U.S. 66 [95 S.Ct. 2080, 45 L.Ed.2d 26] (1975) (as adopted in *Erie Ins. Co. v. Chops*, 322 Md. 79 [585 A.2d 232] (Md.1991)), that no private right of action exists for recovery of statutory interest under Md.Code Ann., Insurance § 19–508?

    3. Did the Circuit Court err in holding that Ms. Daughton's claims are time-barred under Md.Code Ann., State Gov't § 12–202, when her automobile insurance contract has not been "completed" within the meaning of that statute?

**3.** MAIF noted a cross-appeal in which it posed one question asserting, in essence, that the circuit court should have decided the declaratory judgment claim in its favor on an alternative ground. At oral argument, MAIF's counsel stated that its cross-appeal was conditional, meaning this Court only would reach it if we were to reverse the circuit court's judgment in its favor. As we are affirming the judgment, we shall not address the cross-appeal.

**4.** The UCJF was established by ch. 836 of the Laws of 1957. It was funded by assessments levied on all drivers in Maryland and on liability

"The purpose of [MAIF] is to provide the financial security required under § 17–103 of the Transportation Article to those eligible persons that are unable to obtain it from" a member of the Industry Automobile Insurance Association ("IAIA").[5] Ins. § 20–301. MAIF is governed by a 13–member Board of Trustees. *Id.* at § 20–202(b)(1). Seven of its members are appointed by the Governor, with the advice and consent of the Senate, and serve at the pleasure of the Governor. *Id.* at § 20–202(b)(2)(i) and (e)(1). Five of its members are appointed by the Board of Directors of the IAIA and serve four-year terms. *Id.* at § 20–202(b)(2)(ii) and (c)(2). The final member is the Executive Director and is appointed by the Board of Trustees with the approval of the Governor. *Id.* at §§ 20–202(b)(2)(iii) and 20–203(a)(1).

MAIF is funded through "revenues, premiums and other receipts provided by law." *Id.* at § 20–301(b). Its operating expenses are paid out of these monies, rather than through General Fund appropriations. *Id.* at §§ 20–301(c) and 20–302(b). Moreover, its debts and obligations are "not a debt of the State or a pledge of the credit of the State." *Id.* at § 20–302(c). MAIF's funds are managed and invested by a financial management committee consisting of the Executive Director and two members of the Board of Trustees.[6] *Id.* at § 20–303(a)(1) and (2). "Consistent with minority business purchasing standards applicable to units of State government," in investing its funds, the financial management committee "shall attempt to use to the greatest extent feasible minority business enterprises." *Id.* at § 20–303(c)(1)(i).

---

insurers. Its purpose was to satisfy judgments rendered against uninsured or unidentifiable drivers.

5.  The IAIA is composed of "all insurers except for [MAIF] that are licensed to write on a direct basis motor vehicle liability insurance or motor vehicle physical damage insurance in the State." *Id.* at § 20–402(a).

6.  One member must have been appointed by the Governor and one appointed by the IAIA Board of Directors. *Id.* at § 20–303(a)(3).

If MAIF operates at a loss for a given calendar year, it is entitled to recoup the loss via an assessment against private liability insurance carriers doing business in the State. *Id.* at § 20–404. The insurers in turn are authorized to pass this cost on to their customers via an "assessment surcharge" on each policy issued in the following fiscal year. *Id.* at § 20–406.

In its capacity as an insurer, MAIF "issues policies, charges and collects premiums, and adjusts, settles, and pays claims." 85 Op. Atty. Gen. 132, 133 (2000). Like private liability insurance carriers, MAIF generally is subject to the regulatory scheme set forth in the Insurance Article. Unlike private insurers, however, MAIF is required, with limited exceptions, to provide liability insurance to any owner of a "covered vehicle" who has been rejected for coverage by two IAIA members or who has had his or her policy with an IAIA member canceled or not renewed.[7] *Id.* at § 20–502. Different standards also are applied to the rates set by MAIF. Thus, while MAIF's Executive Director is charged with setting MAIF's rates and filing them with the Insurance Commissioner, *id.* at § 20–507(a) and (b), in the conduct of his review, the Commissioner "shall consider not only the rating principles under Title 11, Subtitle 2 of this article,[8] but also the statutory purpose of the Fund under § 20–301 of this title."[9] *Id.* at § 20–507(d).

## B.  PIP Coverage

■■■■ Pursuant to Ins. section 19–505, "each insurer that issues, sells or delivers a motor vehicle liability insurance

---

7. "Covered vehicle" is defined to include cars, trucks, vans, and trailers. Ins. § 20–501(b). It excludes motorcycles, motorbikes, and "low speed vehicle[s]." *Id.* at § 20–501(c).

8. Title 11 of the Insurance Article governs ratemaking for all insurers. Subtitle 2 governs "Prior approval ratemaking."

9. As discussed, *supra,* Ins. section 20–301 states that the purpose served by MAIF is to allow otherwise uninsurable drivers to comply with the compulsory insurance law.

policy in the State shall provide coverage for the medical, hospital, and disability benefits described in this section." These benefits are known as PIP benefits. "The primary purpose of [Ins. § 19–505] is to assure financial compensation to victims of motor vehicle accidents without regard to the fault of a named insured or other persons entitled to PIP benefits." *Huntt v. State Farm Mut. Auto. Ins. Co.*, 72 Md.App. 189, 192, 527 A.2d 1333 (1987) (citations and internal quotations omitted).

Ins. section 19–508(a)(1) requires a motor vehicle liability insurer to pay PIP benefits "periodically as claims for the benefits arise and within 30 days after the insurer receives satisfactory proof of claim." If the insurer fails to pay PIP benefits within 30 days, overdue payments "shall bear simple interest at the rate of 1.5% per month." *Id.* at § 19–508(c).

## FACTS AND PROCEEDINGS

From February 17, 2005, until February 17, 2006, Daughton was the named insured under a MAIF automobile insurance policy. On June 2, 2005, she was involved in an automobile accident.[10] Shortly thereafter, she submitted a PIP claim to MAIF for medical expenses allegedly arising from the accident. In November of 2005, more than thirty days after Daughton submitted her claim, MAIF paid it. It did not pay interest on the late PIP payment, however.

Around two and one-half years later, on April 30, 2008, Daughton filed suit against MAIF in the circuit Court for Baltimore County. Her complaint set forth two counts, seeking damages for breach of contract and a declaratory judgment. As noted above, she alleged that MAIF had failed to timely pay her PIP benefits; that as a result she was entitled to statutory interest on the overdue benefits; and that MAIF had failed to pay the statutory interest.

---

**10.** Daughton was involved in a second automobile accident the following day. Daughton's complaint in the case at bar relates only to the PIP claim from her first accident.

On June 1, 2009, MAIF moved for summary judgment. As relevant to this appeal, it argued that Daughton's breach of contract claim was barred by sovereign immunity because Daughton had not filed suit within the one-year period in which immunity was waived under SG section 12–202; and that the court should declare the parties' rights by ruling that Daughton's claims were barred by sovereign immunity.[11]

Daughton filed an opposition to the motion for summary judgment, arguing, as pertinent here, that MAIF did not enjoy sovereign immunity in its capacity as a seller of insurance policies.

On September 3, 2009, the circuit court entered an order denying the motion for summary judgment. The order further stated that "both parties should see the need to develop this further so as to avoid a remand by Annapolis for facts upon which the argument of government function or proprietary function are based." The court suggested that the parties move to bifurcate the issues. Thereafter, MAIF moved for reconsideration or, in the alternative, for separation of the issues. The motion for reconsideration was denied but the issue of sovereign immunity was bifurcated.

On December 1, 2009, the circuit court held an evidentiary hearing on the issue whether MAIF is a State agency or instrumentality and therefore enjoys sovereign immunity.[12] MAIF called one witness, Mark McCurdy, the Director of Government Policy Administration for MAIF. Daughton did not call any witnesses. McCurdy testified at length concerning the governance of MAIF, its financial management, and the regulations that govern it. He distinguished MAIF's operations from those of a private automobile liability insurance carrier in several key ways, including that MAIF cannot

---

11. In its motion and memorandum of law, MAIF transposed Count I and Count II of Daughton's complaint. In any event, the circuit court granted summary judgment to MAIF on both counts premised on MAIF's assertion of sovereign immunity.

12. The judge who presided over the evidentiary hearing was not the same judge who issued the September 3, 2009 order.

choose whom it insures; that it can void a policy, as opposed to canceling it; and that it can collect against debtors by means of the Maryland Tax Refund Intercept Program, which only is available to state agencies. He also testified about MAIF's right to recoup budgetary shortfalls through the special assessment procedures discussed above. He recounted that MAIF had utilized these procedures "regularly up until 1989." At the conclusion of the hearing, the court held the matter *sub curia.*

On December 17, 2009, the court issued a memorandum opinion and order granting judgment in favor of MAIF on both of Daughton's claims. The court noted that Daughton's counsel had conceded that she had not filed her claim within the one-year period prescribed by SG section 12–202 and, therefore, if MAIF is an agency or instrumentality of the State and therefore is entitled to sovereign immunity, Daughton's claims were barred.

The court emphasized that it was required to analyze "[a]ll aspects of the interrelationship between the State and [MAIF]" to determine if MAIF is an "agency or instrumentality of the State." *The A.S. Abell Publishing Co. v. Mezzanote,* 297 Md. 26, 35, 464 A.2d 1068 (1983). After reviewing a number of cases, which we shall discuss *infra,* the court addressed the two purposes served by MAIF. Explaining that *Harrison v. Motor Vehicle Administration,* 302 Md. 634, 490 A.2d 694 (1985), established that MAIF is a State agency entitled to sovereign immunity when it acts as the successor to the UCJF, the court found that MAIF also serves a "State-wide[ ] public purpose[ ]" in its role as the automobile liability insurance carrier of last resort. In that capacity it advances "the remedial purpose of protecting the public by assuring that operators and owners of other vehicles are able to pay compensation to victims for injuries sustained in automobile accidents."

The court next considered McCurdy's testimony concerning MAIF's governance and operations. It pointed out that MAIF's meetings are open to the public under the Open

Meetings Act, SG § 10–501, *et seq.;* that it is subject to the Maryland Public Information Act ("PIA"), SG § 10–611, *et seq.;* and that it is subject to the Procurement Article of the Maryland Code in that all leases, construction, and other real estate matters involving MAIF must be approved by the General Services Administration. The court explained that the Governor appoints a majority of the members of MAIF"s Board of Trustees and the legislature regulates MAIF's finances by conducting annual fiscal audits. The court emphasized that the legislature has granted MAIF unique "tools" it can use in the case of a budget shortfall and to collect monies owed to it.

Finally, the court rejected an argument raised by Daughton that a State agency can enjoy sovereign immunity when performing a governmental function (according to Daughton, MAIF when acting as successor to UCJF), but not when performing a proprietary function (according to Daughton, MAIF when acting as insurer of last resort). It observed that the authorities cited by Daughton regarding the distinction between proprietary and governmental functions apply only to immunities of local governments or municipalities, not to State sovereign immunity. The court concluded:

> MAIF qualifies as a State agency or instrumentality even when operating in its role as an insurer of automobile drivers who cannot obtain insurance from private insurers, an important public purpose for which MAIF was created by the legislature to meet the need caused by the inability of many motorists to obtain insurance through the private insurance industry.

The court also found unpersuasive Daughton's argument that Ins. section 19–508(c) created a private right of action against MAIF. (Daughton had argued that such an action would not be subject to the one-year filing requirement imposed by SG section 12–202.)

The court concluded that MAIF is an agency or instrumentality of the State that is entitled to sovereign immunity when acting in its capacity as an insurer; that the legislature waived

MAIF's immunity to suit in contract only to the extent set forth in SG section 12–202; and that, having failed to file suit within the period prescribed by SG section 12–202, Daughton's claims were barred. It granted judgment in favor of MAIF on both counts.[13]

The court's memorandum opinion and order was not entered on the docket until January 11, 2010. In the meantime, however, on December 23, 2009, Daughton filed a motion to alter or amend the judgment. Having already received the court's December 17, 2009 memorandum opinion and order, even though it had not yet been docketed, she asserted that the court's decision on the issue of sovereign immunity was not dispositive because the one-year period for filing suit under SG section 12–202 did not begin to run until "the later of: (1) the date on which the claim arose; or (2) the completion of the contract that gives rise to the claim," and the underlying contract, *i.e.*, Daughton's insurance policy with MAIF, was not "completed." In advancing this new argument, she asserted that the contract was not completed because

---

**13.** The circuit court did not draw any distinction between the breach of contract claim and the declaratory judgment action with respect to its sovereign immunity ruling. In fact, the two claims essentially are identical. In the breach of contract claim, Daughton asserted that the PIP payment and interest requirements in Ins. sections 19–505 and 19–508 are implied terms in the MAIF insurance contract, and MAIF breached those terms. In the declaratory judgment claim, Daughton described the justiciable controversy between the parties as "concerning the parties' rights and obligations" under the MAIF insurance contract, with respect to MAIF's payment of covered claims. The declaration of rights sought thus was an interpretation of the MAIF insurance contract linking the claims. Notably, in oral argument, counsel for MAIF pointed out that the MAIF insurance contract contains a "Conformity to statute" clause automatically amending any policy provision that conflicts with Maryland statutory law to conform to it. Accordingly, any interpretation of the language of the MAIF contract respecting the time in which PIP payments must be made and whether interest is to be paid must conform to Ins. sections 19–505 and 19–508.

As the breach of contract and declaratory judgment claims are essentially the same contract claim, the sovereign immunity analysis is the same for both.

MAIF had failed to pay the statutory interest owed on the late-paid PIP benefits.

On January 4, 2010, the court issued an order denying Daughton's motion to alter or amend. The order was entered on January 7, 2010. As noted, on January 11, 2010, the court's December 17, 2009 memorandum opinion and order was entered. Daughton noted a timely appeal on February 1, 2010.

We shall include additional facts as necessary to our discussion of the issues.

## DISCUSSION

## I.

### Sovereign Immunity

In *Katz v. Washington Suburban Sanitary Comm'n,* 284 Md. 503, 507, 397 A.2d 1027 (1979), the Court of Appeals explained the doctrine of sovereign immunity in Maryland:

> The doctrine of sovereign immunity from suit, rooted in the ancient common law, is firmly embedded in the law of Maryland. *See, e.g., Bradshaw v. Prince George's County,* 284 Md. 294, 396 A.2d 255 (1979); *American Structures v. City of Balto.,* 278 Md. 356, 364 A.2d 55 (1976); *University of Maryland v. Maas,* 173 Md. 554, 197 A. 123 (1938). Although originally based on the tenet that "the King can do no wrong," the doctrine is presently viewed as a rule of policy which protects the State from burdensome interference with its governmental functions and preserves its control over State agencies and funds. *See Godwin v. County Comm'rs,* 256 Md. 326, 260 A.2d 295 (1970); *Baltimore v. State,* 173 Md. 267, 271, 195 A. 571, 573–74 (1937); *State v. Wingert,* 132 Md. 605, 104 A. 117 (1918); *State v. B. & O. R.R. Co.,* 34 Md. 344 (1871), *aff'd,* 88 U.S. 456 [21 Wall. 456], 22 L.Ed. 678 (1875); 72 Am.Jur.2d *States, Territories, & Dependencies* § 99 (1974).

(Footnote omitted.) The doctrine applies not only to the State but also to its "agencies and instrumentalities, unless the

General Assembly has waived the immunity either directly or by necessary implication." *Id.* at 507–08, 397 A.2d 1027.

■ In 1976, the General Assembly enacted a conditional waiver of sovereign immunity in contract actions against the State. *See* Laws of 1976, ch. 450. SG section 12–201, captioned "Sovereign immunity defense barred," states that

> the State, its officers, and its units may not raise the defense of sovereign immunity in a contract action, in a court of the State, based on a written contract that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee.

SG section 12–202 conditions the waiver of sovereign immunity as follows: "A claim under this subtitle is barred unless the claimant files suit within 1 year after the later of: (1) the date on which the claim arose; or (2) the completion of the contract that gives rise to the claim." The one-year filing deadline established in SG section 12–202 "is not a mere statute of limitations but sets forth a condition to the action itself." *State v. Sharafeldin,* 382 Md. 129, 148, 854 A.2d 1208 (2004). At the end of the one-year period, "[t]he waiver of the State's immunity vanishes" and any action is barred. *Id.* at 148–49, 854 A.2d 1208.

■ The Court of Appeals has repeatedly recognized that there is no single test for determining whether a statutorily-established entity is an agency or instrumentality of the State for a particular purpose. All aspects of the interrelationship between the State and the statutorily-established entity must be examined in order to determine its status.

*Mezzanote, supra,* 297 Md. at 35, 464 A.2d 1068. The State need not exercise "control over all aspects of an entity's operation" for the entity to be deemed an agency or instrumentality of the State. *Id.*

In *Mezzanote, supra,* the Court of Appeals was concerned with whether the Maryland Insurance Guaranty Association ("MIGA"), was an agency or instrumentality of the State

subject to the PIA. MIGA was established in 1971 by the General Assembly as a "nonprofit unincorporated legal entity" to "protect the public by avoiding financial loss to policyholders and claimants resulting from the insolvency of insurers and by preventing insurer insolvencies." *Id.* at 32, 464 A.2d 1068. The case arose after a newspaper reporter submitted a PIA request to the Chairman of MIGA's Board of Directors.[14] The request was denied on the basis that MIGA was not an agency or instrumentality of the State and, as such, was not subject to the PIA. The newspaper publisher filed suit against MIGA. MIGA moved for summary judgment, asserting that it was "not sufficiently controlled by the State to be characterized as an agency or instrumentality of the State." *Id.* at 30, 464 A.2d 1068. The circuit court granted judgment in favor of MIGA and the publisher appealed.

Before the appeal could be heard in this Court, the Court of Appeals granted *certiorari.* It reversed the judgment of the circuit court, holding as follows:

> The record shows that MIGA was established by the General Assembly so that its existence is subject to legislative control. It was established for a public purpose and has the obligation to protect claimants, policyholders, and indeed the public, by preventing member insurer insolvency and paying claimants on covered claims against an insolvent member insurer.
>
> MIGA can be effectively controlled by the State because its Board is not self-perpetuating. Although the Directors serve fixed terms and the Chairman of the Board is elected by its members, the Commissioner appoints the Directors and fills vacancies. MIGA is not authorized to manage its affairs independent of governmental control. Its plan of operation, consisting of various rules and regulations establishing all of its procedures, is subject to approval and

---

14. The proper spelling of the name of the Chairman was Albert J. Mezzanotte. The name was spelled correctly in the briefs and record extract in the Court of Appeals, but is misspelled in the official reported opinion.

amendment by the Commissioner; the delegation of certain powers by the Board is subject to approval by the Commissioner; its designation of a member insurer as a "servicing facility" is subject to approval and revocation by the Commissioner; and it is expressly subject to examination and regulation by the Commissioner to whom its Board is required to submit an annual report. Moreover, the Commissioner has power to change a decision made by the Board as a result of the authority to entertain appeals from the Board's final actions. Additionally, MIGA has no authority to enforce its regulations. Although all insurers are required to be members, it is the Commissioner, not the Board, who is authorized to revoke a member insurer's authority to operate if it fails to pay an assessment or comply with the plan. Finally, the General Assembly afforded MIGA special status by exempting it from State and local taxes other than property taxes, and from liability for actions taken in the performance of its duties.

In sum, MIGA's existence depends upon the General Assembly; it serves a public purpose, its management is selected by the Commissioner, and is not self-perpetuating; it does not independently manage its affairs or enforce its regulations; its decisions may be reversed by the Commissioner; and it enjoys a special tax and liability status. We recognize that the State does not exercise control over all aspects of MIGA's operation. Nevertheless, the degree of control exercised by the State over MIGA's operation exceeds the degree of control exercised by the City over the Hospital's operation in *Moberly* [*v. Herboldsheimer,* 276 Md. 211, 345 A.2d 855 (1975) ]. After examining all aspects of the interrelationship between the State and MIGA, including the degree of control exercised by the State over MIGA's operation, we are persuaded that MIGA is an agency or instrumentality of the State within the scope of the Public Information Act. Such an interpretation is consonant with the statutory mandate that the Public Information Act be liberally construed in order to effectuate its broad remedial purpose.

*Id.* at 37–39, 464 A.2d 1068. *See also Napata v. Univ. of Md. Med. System Corp.,* 417 Md. 724, 733–37, 12 A.3d 144 (2011) (applying the holding in *Mezzanote* and concluding that the University of Maryland Medical System Corporation is an instrumentality of the State for purposes of the PIA).

In *Central Collection Unit v. DLD Associates Limited Partnership,* 112 Md.App. 502, 685 A.2d 873 (1996), this Court addressed whether the Injured Workers' Insurance Fund ("IWIF") is an agency or instrumentality of the State. At issue in that case was whether the Central Collection Unit's ("CCU") action on behalf of IWIF against DLD to collect on an unpaid debt allegedly owed by DLD was barred by the general three-year statute of limitations for contract actions. The statute of limitations would not apply to IWIF if it were an agency or instrumentality of the State " 'su[ing] in its sovereign capacity in its own courts.' " *Id.* at 508, 685 A.2d 873 (quoting *Cent. Collection v. Gettes,* 321 Md. 671, 675, 584 A.2d 689 (1991)).

We began by rejecting DLD's argument that, by designating IWIF as "independent of all State units," *see* Md.Code (2008 Repl. Vol., 2010 Supp.), § 10–105(a) of the Labor and Employment Article, the legislature effectively had answered the question whether IWIF was an agency or instrumentality of the State. We explained that the legislature's expressed intent that IWIF operate independently of other government departments or agencies, such as the Workers' Compensation Commission or the Office of Administrative Hearings, was not dispositive of whether IWIF is a State agency or instrumentality. We emphasized, moreover, that the legislature's failure to expressly designate IWIF as an agency or instrumentality of the State did not "preclude a finding that [it] is an agency or instrumentality of the State." *DLD,* 112 Md.App. at 509, 685 A.2d 873.

We then turned to an analysis of the "entire relationship between IWIF and the State," ultimately concluding that IWIF is an agency or instrumentality of the State. *Id.* at 510, 685 A.2d 873. We noted that IWIF was created by the

General Assembly; that it is deemed a public body for purposes of the Open Meetings Act; that it is subject to the PIA; and that it enjoys "special property tax exemption status enjoyed by the State." *Id.* We also looked to the governance of IWIF, noting that all of its Board members are appointed by the Governor with the advice and consent of the Senate; that the IWIF Board is required to submit its annual budget to the Senate Budget and Taxation Committee and the House Appropriations Committee for review; and that IWIF must submit an annual report to the Governor. Finally, we addressed IWIF's finances, explaining that the State Treasurer is designated as custodian and must keep IWIF's monies separate from State monies; that IWIF's funds come from premiums paid for insurance and from investments of those funds; that the State Treasurer controls how IWIF's monies are maintained and when the monies are disbursed; and that IWIF is subject to an annual legislative fiscal audit. We held, "[b]ased on the entire relationship" between IWIF and the State, that "IWIF is a state agency or instrumentality for purposes of sovereign immunity." *Id.* at 512, 685 A.2d 873.

As mentioned above, there is one reported case bearing on MAIF's status as an agency or instrumentality of the State. In 1985, in *Harrison,* 302 Md. 634, 490 A.2d 694, the Court of Appeals considered consolidated appeals involving two plaintiffs whose driving privileges had been suspended by the MVA. Both plaintiffs had been involved in automobile accidents while uninsured,[15] had had judgments entered against them which were satisfied by the UCJF, and then had had their driving privileges suspended in keeping with then-existing law. Pursuant to that law, to have their driving privileges reinstated, the plaintiffs were required to repay the judgments the UCJF had paid for them. Neither plaintiff had done so.

More than 12 years after the judgments were entered, the plaintiffs sought to have their driving privileges reinstated by the MVA. When each was denied, they filed separate suits

---

15. The accidents preceded the compulsory insurance law and the creation of MAIF.

against the MVA for injunctive relief. Each argued that the judgment against him was unenforceable because, pursuant to Md.Code (2006 Repl.Vol., 2010 Supp.) section 5–102 of the Courts and Judicial Proceedings Article ("CJP"), more than 12 years had passed without any action by the UCJF, or its successor, MAIF, to renew it. MAIF intervened in both cases, arguing that the limitations period in CJP section 5–102 did not apply to "a specialty taken for the use of the State." CJP § 5–102(c). In one case, the circuit court granted the relief sought by the plaintiff and in the other case the relief was denied.

The Court of Appeals granted *certiorari* on its own initiative. It held that MAIF was an agency or instrumentality of the State when operating in its role as the successor to the UCJF and, as such, could not be bound by the 12–year limitations period. It opined:

> The legislation that included the creation of UCJF formulated a new State policy with a dual aspect whereby (1) a measure of compensation was provided to those injured or to the families of those killed through the negligence of uninsured motorists and (2) the further use of the highways of the State was denied to such uninsured motorists and their vehicles until remuneration had been made and future financial responsibility had been assured.

> Providing for the welfare of the public and for the correction or rectification of offenders against the health and security of the public are fundamental elements of governmental action. The Legislature committed to UCJF and by later amendment to MAIF an essential role in the enforcement of that governmental function. We hold that in the exercise of that essential role UCJF and its successor MAIF are State agencies which have inherited the sovereign attributes of the State and are performing a governmental function. Entry of the Harrison and Thacker judgments to the use of UCJF was the legal equivalent of their entry to the use of the State. Accordingly, to the extent of the payments by UCJF, those judgments are "enforceable judgments" within the meaning of Tr. Art. 17–201, *supra,* as

to which the provisions of § 5–102 of the Courts and Judicial Proceedings Article form no bar.

302 Md. at 647–48, 490 A.2d 694.

We return to the instant case. Daughton contends the circuit court should have looked to MAIF's "day to day operations" in its role as an insurer, rather than to the statutory and regulatory scheme governing its operations as a whole, in deciding its entitlement *vel non* to sovereign immunity. Relying largely on information from MAIF's website and opinions of the Office of the Attorney General ("OAG"), Daughton argues that, because MAIF describes itself as an *"independent* agency of the State"˙and is not funded by the State, it "enjoys an independent and overwhelmingly *private* financial and corporate identity." (Emphasis in original.) Daughton maintains that, although MAIF "operates for the public's welfare and serves a purely governmental function" in its role as successor to the UCJF, it acts in a private, nongovernmental capacity in its role as an insurer. She asserts that the decisions in *Harrison* and *DLD* confirm that a state-created entity only will benefit from sovereign immunity when it is performing a governmental purpose.

We disagree that the cases we have discussed above support Daughton's contention. In *Mezzanote* and *Harrison,* the Court of Appeals decided the sovereign immunity question by considering the statutory mandate creating the entity in question; the entity's public purpose; and the degree of control and regulation to which the entity was subject. In neither case did the Court limit its consideration to the "day-to-day operations" of the entity in reaching its determination. Moreover, the *Harrison* Court necessarily only reached the issue of MAIF's role as successor to the UCJF because the judgments at issue in that case arose prior to MAIF's creation.

Indeed, as we see it, the reasoning employed in *Harrison* in concluding that MAIF acts as an agency of the State in its role as successor to the UCJF applies with equal force to MAIF when it acts in its role as the automobile liability insurance carrier of last resort in Maryland. As the circuit

court recognized, in that capacity, MAIF "[p]rovid[es] for the welfare of the public." *Harrison, supra,* 302 Md. at 648, 490 A.2d 694. MAIF was established by the General Assembly when it enacted compulsory insurance legislation for the clear public purpose of providing liability insurance to those drivers who otherwise would be uninsurable under the new law. In its role as an insurance provider, MAIF protects the public by ensuring that the vast majority of drivers on Maryland roads have automobile liability insurance in place. Without an insurance-providing entity such as MAIF, the compulsory insurance laws would not fully protect the public, as they were meant to do.

Moreover, upon application of the same factors considered by this Court in *DLD,* it becomes readily apparent that MAIF is an agency or instrumentality of the State not only in its role as successor to the UCJF but also in its role as an issuer of insurance policies. MAIF owes its existence to an act of the legislature. The majority of the members of its Board of Trustees are appointed by the Governor and serve at his pleasure. MAIF"s Executive Director also must be approved by the Governor. Thus, the Executive Branch maintains a significant degree of control over MAIF"s governance even while allowing it to operate as an independent entity. The legislature also asserts control by conducting annual or semi-annual fiscal audits and by approving MAIF"s budget on an annual basis.[16]

Like IWIF, MAIF is subject to the PIA and the Open Meetings Act. It also must comply with the more elaborate bid procedures set forth in the State Finance and Procurement Article with respect to leases, construction, and other real estate matters.[17] MAIF"s personnel are State employees and

---

**16.** McCurdy testified that the Senate Budget and Taxation Committee and the House Appropriations Committee also occasionally place restrictions on MAIF's budget by, for example, prohibiting merit pay raises for personnel in the next fiscal year.

**17.** MAIF is specifically exempted, however, from compliance with these bidding procedures for procurement of supplies. *See* Md.Code (2009

enjoy the protections of the Maryland Tort Claims Act. *See* SG § 12–101(a)(2)(ix)(defining "State personnel" under the Act to include employees of MAIF). Thus, MAIF is treated like other State agencies in its operations and procedures.

■ That MAIF functions in many ways like a traditional, private liability insurance carrier is not determinative of its status as an agency or instrumentality of the State. It was formed by the State for the express purpose of operating in that capacity, and it advances an important public interest when it does so. It is subject to a degree of State control and regulation that readily distinguishes it from private insurers. For all of these reasons, we conclude that MAIF is an agency or instrumentality of the State for purposes of sovereign immunity when it acts in its role as an insurance-providing entity.

## II.

### Private Cause of Action

■ Daughton next contends that Ins. section 19–508(c) creates by implication a private right of action independent of SG section 12–201. As discussed above, Ins. section 19–508(c) provides that "[p]ayments of [PIP] benefits that are not made in accordance with this section and that are overdue shall bear simple interest at the rate of 1.5% per month." According to Daughton, the General Assembly would not have created this "express monetary remedy" without also creating an implied right to pursue that remedy. MAIF responds that Maryland never has recognized a private cause of action when a statute is silent as to the creation of that right, and that it should not do so in this instance.

The circuit court rejected Daughton's argument that Ins. section 19–508(c) created an implied private right of action. We are similarly unpersuaded.

Repl.Vol., 2010 Supp.) § 11–203(a)(1)(ix) of the State Finance and Procurement Article.

■ In advancing her argument, Daughton relies on the test set forth by the United States Supreme Court in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), as applied by our Court of Appeals in *Erie Ins. Co. v. Chops*, 322 Md. 79, 585 A.2d 232 (1991). Under the *Cort* test, in determining whether a private cause of action arises under a statute, a court must look to whether there is indicia of legislative intent to create such a cause of action, whether "the plaintiff is one of the class for whose special benefit the statute was enacted, and whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff." *Erie, supra*, 322 Md. at 91, 585 A.2d 232 (citing *Cort, supra*, 422 U.S. at 78, 95 S.Ct. 2080).

Daughton points to no Maryland cases, however, applying the *Cort* test and recognizing an implied private right of action. A reading of the plain language of Ins. section 19–508(c) simply bears no indicia of any legislative intent to create a private cause of action. It also would not be consistent with the underlying legislative scheme to imply such a benefit where, as here, a PIP claimant could bring suit under the insurance contract giving rise to the claim to PIP benefits.[18]

Daughton's problem in this case is not the absence of an avenue for relief in the court system. As we explained above, *supra* at n. 13, the MAIF policy incorporates the statutory requirements for timely payment of PIP benefits and interest

---

**18.** An administrative remedy also exists. COMAR 31.15.07.06 requires insurers paying overdue claims for PIP benefits to automatically include the interest provided for under Ins. section 19–508(c). COMAR 31.15.07.10 states that the penalty for violation of this regulation (among others) "shall be assessed in accordance with [Ins.] §§ 27–301, 27–305, and 27–306."

Ins. section 27–301 provides for an administrative remedy for violations of Ins. section 27–303, prohibiting unfair settlement claim practices, and of Ins. section 27–304, prohibiting unfair settlement claim practices utilized with such frequency so as to constitute a general business practice. Ins. section 27–305 authorizes the Commissioner to penalize any insurer found to violate either of those sections. Ins. section 27–306 authorizes appeals from decisions of the Commissioner pursuant to this subtitle.

on late PIP payments. To the extent these requirements were violated, Daughton could pursue a breach of contract action; and indeed she did so. She did not do so in a timely manner under SG section 12–202, however, and therefore her claim was barred. Thus, Daughton's purpose in seeking an implied private right of action arising out of Ins. sections 19–505 and 19–508 is not to fill a gap in access to relief but to avoid the litigation bar of SG section 12–202—something she could have done by filing her breach of contract claim earlier. This purpose does not and should not justify our recognizing an implied private right of action.

## III.

### Completion of Contract

■ Finally, Daughton contends the contract on which her claim was based—her automobile insurance policy with MAIF—has not yet been "completed" and, therefore, pursuant to SG section 12–202, the one-year period for filing suit has not begun to run, and her claims cannot be barred. She takes the position that the contract cannot have been completed because MAIF failed to pay the statutory interest owed pursuant to Ins. section 19–508(c). In other words, because MAIF is in breach of the contract, the contract remains incomplete. As noted, Daughton raised this argument for the first time in her motion to alter or amend. MAIF responds that the issue is not preserved for appellate review, was waived, and in any event lacks merit.

■ The issue was preserved for review, as it was raised in the motion to alter or amend (and then was denied). *See* Md. Rule 8–131(a). We agree with MAIF that the issue was waived, however. Also, from what we can discern from the record, it has no merit.

As already stated, SG section 12–202 provides that "[a] claim under this subtitle is barred unless the claimant files suit within 1 year after the *later of: (1) the date on which the claim arose;* or *(2) the completion of the contract* that gives rise to the claim." (Emphasis added.) In its motion for

summary judgment, MAIF asserted that Daughton failed to file her claim within the one-year period designated in SG section 12–202. Daughton did not challenge this assertion in her opposition. Instead, she argued that MAIF is not an agency or instrumentality of the State to which SG section 12–202 would apply. Indeed, her lawyer conceded during the December 1, 2009 hearing that, if MAIF were an agency or instrumentality of the State, her claims were barred by the one-year filing condition in SG section 12–202.

In her motion to alter or amend, Daughton argued that any "concession" made by her counsel during the course of the December 1, 2009 hearing with respect to the running of the one-year filing period under SG section 12–202 was the product of "error and inadvertence." She asserted that it was, and always had been, her position that the underlying contract with MAIF was not completed. The transcript of the hearing belies this assertion.

During the hearing, at the start of closing arguments, the trial judge asked Daughton's lawyer whether "there is any question of fact that the claim was not filed within one year." Counsel replied, "No your honor. It was filed within the three year Statute of Limitations, but it would not meet, if the one year limitation is imposed it would not meet that limitation." Then, during closing argument, when MAIF's lawyer was discussing the automobile accident that gave rise to Daughton's PIP claim, Daughton's lawyer interjected that those facts were "not germane" and said: "I believe we conceded that if they win the sovereign immunity issue it wasn't filed within a year. If they lose the sovereign immunity issue it was filed within a three year limitation, and (inaudible)." The trial judge immediately clarified the concession as follows:

THE COURT: Okay. [Counsel for Daughton] concedes that the claim was not filed within the one year provision of [SG] Section 12–202, and therefore if governmental immunity applies the claim is barred. Correct [counsel for Daughton]?

[COUNSEL FOR DAUGHTON]: Yes your honor.

The concession that, if MAIF enjoys sovereign immunity, Daughton's claims were barred under SG section 12–202 for failure to file them within one year of the date on which they arose is clear from the record and hardly was "inadvertent." The clear concession was completely at odds with any assertion that the one-year period for filing suit had not begun to run at all. Daughton was bound by the concession made by her counsel. *See Prescoe v. State*, 231 Md. 486, 494, 191 A.2d 226 (1963). Accordingly, she waived the issue whether the contract, that is, her automobile insurance policy with MAIF, ever was completed within the meaning of SG section 12–202.

On the merits, the Exhibits to MAIF's motion for summary judgment establish that MAIF paid Daughton $2,500 in PIP benefits by a check dated September 20, 2005; [19] that counsel for Daughton sent MAIF letters on October 25, 2005, and November 7, 2005, demanding additional payments; and that on November 21, 2005, MAIF sent Daughton's counsel an additional check for $2,427 for PIP benefits, and denied any further payment. The checks sent by MAIF to Daughton did not include payment of interest.

The Exhibits further disclose that Daughton's MAIF automobile policy was canceled effective June 25, 2005, for non-payment of an increased premium amount. MAIF had increased the premium when its investigation revealed that Daughton's garaging address was in Baltimore City, not northern Baltimore County. (Daughton disagrees that her automobile ever was garaged in Baltimore City.)

Given that the insurance policy no longer was in force as of June 25, 2005, and as of November 21, 2005, MAIF had denied any further payment to Daughton on her claim, the canceled insurance policy had to have been a completed contract as of the latter of those two dates. To read SG section 12–202 as Daughton suggests—to mean that a contract alleged to have been breached is not completed because it allegedly was

---

**19.** That payment was for Daughton's PIP claim arising from the second automobile accident.

breached—would be circular reasoning and would produce the untenable result that, in *all* actions stating breach of contract claims against State agencies or instrumentalities, the one-year filing deadline in SG section 12–202 would not have started to run before suit was filed and liability was established. The phrase in that section calling for suit to be filed within one year after "the date on which the claim arose" would be meaningless, because that never would happen before "the completion of the contract," and it is the latter of those two dates that controls.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

